**CALIFORNIA CONCRETE PIPE CO.,**
**Plaintiff,**

v.

**AMERICAN PIPE & CONSTRUCTION COMPANY, Martin-Marietta Corporation, United Concrete Pipe Corporation, and American Vitrified Products Co., Defendants.**

Civ. No. 65-674-MP.

United States District Court
C. D. California.

July 31, 1968.

Maxwell M. Blecher, San Francisco, Cal., for plaintiff.

George W. Jansen, San Diego, Cal., for defendant American Pipe and Construction Co.

Gordon F. Hampton, Don T. Hibner, Jr., Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for defendant Martin-Marietta Corporation.

John J. Hanson, Robert E. Cooper, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendants United Concrete Pipe Corporation and American Vitrified Products Co.

## DECISION ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

PENCE, District Judge.

Plaintiff California Concrete Pipe Co. (CCP) has sued under Section 4 of the Clayton Act (Title 15 U.S.C. § 15) for treble the damage allegedly suffered as a result of defendants' violations of the antitrust laws.

Between October 1962 and December 31, 1963, plaintiff was in the business of manufacturing and selling concrete conduit pipe at its plant in the City of Industry, California. On December 31, 1963 plaintiff severally sold virtually all of its manufacturing equipment to defendants herein. The sales transactions were jointly conducted pursuant to an escrow agreement administered by the Bank of America. In the course of closing American Pipe & Construction Company's (American) escrow,

plaintiff's agent Kearns, on behalf of CCP, signed a general release in favor of American.[1]

The complaint herein was filed on May 3, 1965. On July 15, 1965 defendants filed motions to dismiss pursuant to Rule 12(b) (6), F.R.Civ.P., for failure to state a claim on which relief could be granted. Defendant American asserted immunization from the action as a named beneficiary of the release. Defendants Martin-Marietta Corporation, United Concrete Pipe Corporation, and American Vitrified Products Co. maintained that under the applicable law a general release executed in favor of one tort-feasor frees unreleased joint tort-feasors from liability. Plaintiff opposed defendants' motions, contending the release was either void in law or voidable in equity, or, at any rate, was ineffective as applied to the unnamed joint tort-feasors.

Since defendants' motions considered matters ouside the pleadings they were treated as motions for summary judgment under Rule 56, F.R.Civ.P. These motions were denied on October 17, 1966, the court finding "significant and material questions of fact as to the validity of the alleged release", but then, *sua sponte,* severed all issues involving the release from the case in chief pursuant to Rule 42(b), F.R.Civ.P., and ordered that (1) the voidability of the release be tried separately before the bench under its equity jurisdiction, and (2) written briefs be submitted stating the parties' positions on whether (A) the release was applicable to the unnamed joint tort-feasors under Twentieth Century-Fox F. Corp. v. Winchester Drive-In Th., 351 F.2d 925 (9 Cir. 1965), cert. denied 382 U.S. 1011, 86 S.Ct. 620, 15 L.Ed.2d 526 (1966),[2] or

(B) the validity of the release must be submitted to a jury under Radio Corp. of America v. Raytheon Mfg. Co., 296 U.S. 459, 56 S.Ct. 297, 80 L.Ed. 327 (1935).

A bench trial was conducted on March 1–3, 1967, at the conclusion of which this court held that the release was not voidable in equity.[3] Subsequently, on November 8, 1967, plaintiff voluntarily dismissed its claim against American, notwithstanding that the court had not yet ruled on plaintiff's argument that the release could be found void at law. Accordingly, the only questions now remaining relate to the effect of the release on CCP's claims against the remaining joint tort-feasors not specifically named as beneficiaries therein.

A. *Applicability of release to unnamed joint tort-feasors under* Twentieth Century-Fox F. Corp. v. Winchester Drive-In Th., 351 F.2d 925 (9 Cir. 1965), cert. denied 382 U.S. 1011, 86 S.Ct. 620 (1966).

In *Winchester* the Ninth Circuit squarely held that under the applicable federal law, in the absence of an express reservation, a general release of one joint tort-feasor releases all joint tort-feasors from liability for the tortious act. Plaintiff contends that significant factual distinctions between this action and *Winchester* preclude application of the *Winchester* rule in the instant context. It specifically maintains that the following factors permit it to escape the impact of *Winchester:* (a) the *Winchester* release was given at a time when the plaintiff had an antitrust claim pending; (b) the *Winchester* release was part of the settlement of the antitrust claim, and was supported by independent economic consideration; and

---

1. The relevant language of the release reads:

"1. The First Party [CCP] does hereby release and discharge the Second Parties [American and Etiwanda], their directors, officers, agents and employees, from any and all claims and demands of whatsoever nature, antici-

pated or unanticipated, or known or unknown."

2. See Pre-Trial Order No. 4 (filed December 20, 1966).

3. See Decision On Validity Of Release, dated June 29, 1967.

(c) the *Winchester* plaintiff was represented by experienced antitrust counsel. Plaintiff argues that these factors are not present here, and, relying on the language in *Winchester* that the releasor could have reserved its rights against joint tort-feasors, but, "with the advice of antitrust counsel, failed to do so",[4] therefore contends that the appellate "court never intended its rule to apply to releases executed outside the perimeter of settling an existing antitrust claim."[5]

This court does not find any such limitation in the *Winchester* rule. In determining the existing federal law governing the effect of a general release involved in an antitrust case, the appellate court did not seize upon any limited "antitrust rule." Instead, it turned to the Restatement of Torts, section 885(1)—a rule applying to all joint tort-feasor release problems. In supporting its selection of the applicable rule of law, the court cited Dura Electric Lamp Co. v. Westinghouse Electric Corp., 249 F.2d 5 (3 Cir. 1957) as being nearly on all fours with the *Winchester* problem, and then continued:

> "Numerous other trial courts have reinforced the proposition that the present Restatement position is an accurate expression of the current status of the law of general releases." (Citing cases.)

The court continued:

> "The * * * rule does not prevent an injured party from reserving rights against one or more joint tort-feasors while releasing others. It merely requires that he announce his intent, and express that reservation in the release agreement. Such a rule has the substantial advantages of eliminating disputes as to the intended scope of the release. It discourages chicanery in the negotiation of the release. We find it difficult to be-

lieve that the incorporation in a release of a clear statement of its scope and intent will place too heavy a burden on counsel charged with the responsibility of drafting the instrument.

> \* \* \* \* \* \*

> "We hold * * * that appellees could have reserved rights against other joint tort-feasors, * * * but * * * with the advice of antitrust counsel, failed to do so. * * * We can conclude that this was not happenstance. In the absence of such an express reservation, all joint tort-feasors are released of liability * * *."[6]

The release here at issue is clearly and unequivocally an all-inclusive general release. There is no indication in the language of the release of any intent to exclude certain joint tort-feasors. "In the absence of such * * * reservation, all joint tort-feasors are released. * * *"

Even if the thrust of the *Winchester* case were intended by the appellate court to be narrowly limited to the antitrust situation postulated by plaintiff, the facts in the instant case would, as this court sees it, bring the questioned release within even those narrow confines. In its "Decision On Validity Of Release",[7] this court found as a fact that plaintiff had discussed with its attorney on several occasions in 1963, before the release was executed, the possibility of antitrust action against American and others in the concrete pipe market. Also, this court accepted "as true the basic facts stated in the memorandum made by Edwards, president of American, on November 13, 1963",[8] viz., "Hooker [of CCP] made the passing remark tthat he would sign any kind of an agreement we wanted clearing us of any charges of unfair competition or restraint of trade, etc." CCP's attorney—with whom the possibility of antitrust action had been dis-

---

4. 351 F.2d at 931.

5. Summary of Plaintiff's Contentions, p. 7 (dated September 14, 1967).

6. 351 F.2d at 930–931.

7. See n. 3, supra.

8. See n. 3, supra, at p. 15.

cussed—examined all of the documents in the escrow shortly before and immediately after the execution of the release although he denied ever seeing the release. Thus the release as executed fits into the basic format of *Winchester,* even if its application were to be construed as limited, as plaintiff argues—and this court rejects. Thus under either paintiff's or this court's construction of the application of *Winchester,* all defendants, being joint tort-feasors, were released by plaintiff's general release to American.

B. *Must the validity of the release be submitted to a jury under Radio Corp. of America v. Raytheon Mfg. Co., 296 U.S. 459, 56 S.Ct. 297 (1935)?*

As indicated, this court has declared the release in question to be a valid one. Plaintiff, however, has argued that notwithstanding its execution of a general release, it is nevertheless entitled to a full jury trial on all issues because of the basic allegations in its complaint [9] and because "the release * * * was 'inextricably connected with the conspiracy,' was 'an act in furtherance'" thereof and is thus " 'tainted by the conspiracy and hence void.' " [10] In support of its position, plaintiff relies on the principles allegedly enunciated in Radio Corp., etc. v. Raytheon Co., supra, and Westmoreland Asbestos Co. v. Johns-Manville Corp., 39 F.Supp. 117 (S.D.N.Y. 1941). *Raytheon* actually involved the narrow procedural issue, arising prior to the abolition of separate law and equity courts, of "whether in the circumstances here exhibited the validity of a release pleaded by a defendant as a bar to a cause of action at law is triable in equity." [11]

In *Raytheon* plaintiff had alleged that the defendant RCA had driven it out of business by a combination and monopoly in restraint of trade. Defendant pled a general release and moved to transfer the case over to equity to determine the validity of the release. This motion was granted and the district court sitting as a court of equity adjudged the release valid. *"No evidence was offered or introduced at any stage of the proceedings* but the court examined a copy of the contract between the parties embodying the release."* (Emphasis added.) [12]

Appeal followed, resulting ultimately in the Supreme Court opinion. In that opinion, the Court pointed out that the plaintiff had expressly disclaimed any right to relief in equity and that defendant's plea in bar of a release was not an equitable defense, then said:

"In thus delimiting the issues we delimit at the same time the scope of our decision. We do not attempt to say whether the release will collapse upon the showing of an illegal combination or will retain an independent life. That is matter for the trial at law, where the bond between monopoly and surrender can be shown with certainty and fulness. Till then it will be best to put aside as premature not a little that is said in the opinion of the court below. *Enough for present purposes that there are issues triable at law, and none triable in equity. We leave our ruling there.* (Emphasis

---

9. Defendants "in furtherance of their combination and conspiracy to unreasonably restrain trade and to monopolize * * * agreed to * * * eliminate the competition of [CCP and] to drive [CCP] out of business by:
    "(a) Warning * * * [CCP] * * * that if they did engage in [the concrete pipe] business [CCP] would be run out of business; and
    "(b) submitting bids on concrete pipe at unreasonably low prices; and
    "(c) * * * purchasing most of plaintiff's equipment after plaintiff was weakened by defendants' price cutting." (Plaintiff's Amended Complaint for Damages, filed March 1, 1966, Count One, paragraph 16.)

10. Defendant's Supplemental Pre-Trial Statement, filed February 14, 1967, pp. 1–2, quoting from Plaintiff's Supplemental Pre-Trial Statement at p. 2.

11. 296 U.S. at 459, 56 S.Ct. at 298.

12. Raytheon Mfg. Co. v. Radio Corp. of America, 76 F.2d 943, 945.

added.) 296 U.S. at 463, 56 S.Ct. at 299.

Westmoreland likewise was concerned with a procedural problem. Defendant asked for a dismissal of plaintiff's complaint by pleading as a bar the release it had obtained from the plaintiff. Plaintiff claimed (1) that the release was invalid because it was procured through fraudulent representations and that defendant's wrongdoing continued unabated thereafter, and (2) that the release was invalid because it was obtained with the intention on the part of the defendant to use it as an additional means of achieving its monopoly. The court denied defendant's motion for dismissal pointing out that in order for a release to operate as a complete defense it would have to cover misconduct both before and after its execution. The court stated that any release purporting to release claims *in futuro* would be void as against public policy, citing *Raytheon*. There is no such *in futuro* problem here.

As to the validity of the release as a defense for injuries suffered by the plaintiff prior to its execution, the court in *Westmoreland* held that whether the release was obtained by fraud and deceit was a question for the trier of fact and therefore denied defendant's motion to dismiss. The question of whether the instant release was obtained by fraud or deceit has already been tried and determined by this court.

"The court finds that not alone has the plaintiff failed to sustain its burden of proving by clear, cogent and convincing evidence that American secured the execution of the release by fraud but there is not even an indication of any fraudulent act committed by American or that there was any implied or constructive fraud or overreaching on the part of American in securing the release. There was no evidence of any act or failure to act by American which was 'fitted to deceive' CCP in re the release or its import. The idea of the release did not originate with American's officers. Kearns had the same thought as did American's attorneys. The release was not surreptitiously inserted among the documents to be signed in closing the escrow. * * * It was not put in as part of a deliberate financial squeeze play by American. * * *

"The release was the brainchild of American's attorneys, advised as a normal legal defensive action. It was not a nauseous potion pressed upon CCP, which a calculating American knew CCP must drink if its financial thirst was to be assuaged. There is no evidence that American was attempting to take any unfair advantage of the situation brought about by Hooker's financial plight or his health." (Footnotes omitted.) [13]

In the face of those findings, nevertheless the plaintiff, in insisting that it has a right to a jury trial, hypothesizes somewhat as follows: Acts which normally are legal may become illegal if part of, or in furtherance of, an illegal conspiracy. A release, if it be an illegal contract, or a contract to achieve an illegal purpose, is void. A release even though valid, if secured as part of or in furtherance of an illegal conspiracy becomes tainted thereby and becomes void. (There is, of course, nothing wrong with the above logical analysis of the state of the law.) Plaintiff here has pleaded that the defendants participated in a conspiracy, one aim of which was to eliminate competition. Logically, elimination of competition carries with it the implication that the competitor will quit his business. A reasonable foreseeable result of eliminating CCP would be the acquisition of its capital assets with a like reasonable foreseeable result of demanding a release. Therefore, plaintiff concludes, only a jury can determine if defendants participated in a conspiracy to eliminate CCP as a competitor; only a jury has the right to determine whether the defendants acquired CCP's fixed assets in implementation of the con-

---

13. See n. 3, supra, at pp. 16–17.

spiracy; only a jury could determine, since the release has already been found to be a condition of the equipment sale, whether or not the release was but an act in furtherance of the conspiracy and hence illegal; only a jury could determine after a full trial, from evidence both circumstantial and direct, whether this release was so tainted and therefore void. Such is the hypothesis upon which plaintiff maintains that *Raytheon* forecloses a summary judgment and demands a jury trial on its "part and parcel" theory.

When *Raytheon* was written, the mighty tools of discovery provided by Rule 26, F.R.Civ.P., had not been placed in the hands of counsel for litigants. The present body of the law on summary judgment permitted by Rule 56 had not yet been formulated and defined. Sketch pleading as now interpreted was impermissible. The division between the courts of law and equity was over-sharp and distinct. The law then laid down in *Raytheon* was, of course, sound, but the application of that law must perforce now be modified by the impact of the Rules of Civil Procedure upon both pleading and practice.

■ It is no longer sufficient for a party, when faced with a motion for summary judgment, only to respond: "But I have raised the issue in my pleadings." [14] Pleadings, standing alone, cannot now stay the impact of a motion for summary judgment when accompanied by an overwhelming mass of evidentiary material—even in the hypersensitive area of antitrust litigation.[15] It is no longer a sufficient resistance to a motion for summary judgment for plaintiff simply

and bleakly to contend that the obtaining of a release was a part and parcel of the antitrust conspiracy.[16]

Such then is now the posture of defendants' motion for partial summary judgment in the face of the sweeping statement of *Raytheon:*

"A release * * * is a good defense at law, unless its effect is overcome by new matter in avoidance. This will happen, for illustration, when it is so much a part of an illegal transaction as to be void in its inception. If it is subject to that taint, a court of law is competent to put it out of the way." 296 U.S. at 462, 56 S.Ct. at 299.

As indicated above, this court found at the special trial that the idea of the release came from American's attorneys, as a normal legal defensive action.[17] Even plaintiff does not contend that there was ever any meeting, discussion or agreement among any of the defendants about procuring a release from CCP.

■ The discovery procedures open to the plaintiff would have permitted plaintiff to show sufficient validity for its "part and parcel" allegation, at least to estop summary judgment if there remained any undetermined issue of fact concerning the genesis and execution of the release. Interrogatories directed by plaintiff to all defendants did but show that which appeared at the special trial, viz., none of the defendants other than American were aware that American was requesting a release; there was never any meeting between any of the defendants or any other corporation concerning the release; no defendant was ever advised that if American obtained a release from

14. This is not contra to Carter v. Twentieth Century-Fox Film Corporation, 127 F.Supp. 675 (W.D.Mo.1955). In *Carter*, the plaintiff set forth in her pleadings the execution of a release in defendant's favor, which, so she alleged, she was compelled to execute "against her will, wishes and desires," as an objective (i. e., part and parcel) of the national antitrust conspiracy of the defendants. The court, "accepting as we must the facts well pleaded in the complaint to be true" (at 678), could and did but overrule defendant's motion for a judgment of dismissal predicated only on her execution of a general release.

15. See 28 U.S.C.A. Rule 56, F.R.Civ.P., n. 41; Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Limited, 185 F.2d 196 (9 Cir. 1950), cert. denied 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680 (1951).

16. Taxin v. Food Fair Stores, Inc., 287 F. 2d 448 (3 Cir. 1961).

17. See n. 3, supra, at p. 17.

CCP the other defendants would likewise be released from all antitrust liability; there was never any pre-release mention of the release by or between any of the alleged joint tort-feasors, nor did any defendant other than American have any prior knowledge of the existence of the release before it was presented to Kearns (CCP) for his signature on December 31, 1963. There was a complete negation of any conspiracy among the defendants to obtain the release in question.

The sole evidentiary material which plaintiff has produced in opposition to defendants' motion that, as the court sees it, might have some tenuous relevancy, is "that at least one defendant [United] threatened the plaintiff with respect to its *prospective entry* into the concrete pipe business in the fall of 1962" (emphasis added),[18] i. e., that it would be run out of business.

Here it was at least incumbent upon the plaintiff, in opposing the motion for summary judgment, to show some special or unusual tie-in of the release with the alleged general conspiracy. A release applying only to past acts could not facilitate any restraint of trade which had already been accomplished. As was said by the court in *Taxin:*

"[W]e cannot see how the release could have any effect except to compromise existing claims for past misconduct." 287 F.2d at 451.

A factually unsupported hypothesis is not enough to forestall summary judgment.

"[P]laintiff's unexplained and unsupported allegation that the obtaining of the release was part of or in furtherance of the original conspiracy does not suffice to prevent the granting of summary judgment." *Taxin,* 287 F.2d at 451–452.

## CONCLUSION

Defendants' motion for partial summary judgment is granted.

18. Plaintiff's Reply Brief in Support of Contention That There Is A Jury Ques-

This ruling does not, of course, conclude this case. There still remain plaintiff's allegations of unilateral attempts to monopolize, as well as its claim under the Cartwright Act. A pretrial conference on these issues will be scheduled in the very near future.

tion On Whether This Release Is Void In Law.