**REDEL'S INC., Plaintiff-Appellant,**

v.

**GENERAL ELECTRIC COMPANY,**
**Defendant-Appellee.**

No. 73–2268.

United States Court of Appeals,
Fifth Circuit.

July 31, 1974.

---

See also, D.C. 54 F.R.D. 443.

Walter A. Apfelbaum, H. James Catlin, Jr., Miami, Fla., for plaintiff-appellant.

Charles A. Kimbrell, Thomas E. Scott, Jr., Miami, Fla., for defendant-appellee.

Before GOLDBERG and AINSWORTH, Circuit Judges, and LYNNE, District Judge.

LYNNE, District Judge:

## I.

### STATEMENT OF THE CASE

This is a private antitrust action for treble damages under the Clayton Act, 15 U.S.C. §§ 13 and 14, brought by appellant, Redel's, Inc. (hereinafter referred to as "Redel's"), a former franchised dealer of appellee, General Electric Company (hereinafter referred to as "G.E.").[1] The district court granted G.E.'s motion for partial summary judgment, holding that all claims arising prior to February 12, 1971, were barred by a general release set forth in the "Dealer Franchise Agreement." Redel's application for leave to appeal from an interlocutory order pursuant to 28 U.S.C. § 1292(b) was denied by this Court on November 16, 1972. Final judgment was entered by the district court on March 30, 1973, following execution of a stipulation voluntarily dismissing without prejudice those claims arising subsequent to February 12, 1971. Redel's then filed its notice of appeal.

## II.

### FACTUAL BACKGROUND

Redel's was for many years a franchised dealer of G.E. merchandise. In maintaining the franchise relationship, G.E. dealers, including Redel's, renewed their franchise agreements annually. The last franchise agreement between Redel's and G.E. was executed on March 3, 1969. However, this agreement was significantly different from prior agreements. It was to be in perpetuity with yearly addenda rather than a contract requiring renewal annually. The present controversy results from G.E.'s inclusion in that agreement of a general release provision. The release, found in Section 5(i) of the franchise agreement, reads as follows:

"(i) in consideration of the execution of this agreement by the District, and of such sales of said products as the District may make to the Dealer within the term hereof, the Dealer hereby releases General Electric Company, from all claims, demands, contracts, and liabilities, if any there be, as of the date of the execution of this agreement by the Dealer, except claims founded upon or indebtedness which may be owing under (i) a written contract other than a franchise agreement or (ii) written cooperative advertising and product service plans issued by the District;"

The franchise agreement also contained provisions covering annual addenda. The purposes of the addenda were clearly set forth in Sections 3(a) and 3(b):

"3. The Dealer agrees:

(a) to achieve an annual sales quota of products as is agreed to between the Dealer and the District in the annual addendum to this franchise;

(b) to maintain at all times on his sales floor a display of products of at least the minimum number as is agreed to between the Dealer and District in the annual addendum to this franchise."

The addenda contemplated here were to provide the necessary flexibility for routine and periodic modification of the basic agreement. The franchise agreement itself was to be in perpetuity, to

---

1. Jurisdiction was asserted pursuant to 15 U.S.C. § 15, 15 U.S.C. § 26, and 28 U.S.C. § 1337.

remain fully effective until terminated by the parties pursuant to the termination clause found in Section 5(d).

On February 12, 1971, Redel's executed an annual addendum to the franchise agreement of March 3, 1969, which set forth minimum sales requirements for various appliances during the calendar year 1971. No minimum sales floor display for appliances was specified. The addendum, printed by G.E. as a standard form on one page, contained no other provisions and in no way referred to the general release contained in the franchise agreement. The instrument was simply described as "the Annual Addendum for the Year 1971 to the Dealer Sales franchise."

Redel's filed the present antitrust action against G.E. on January 21, 1972, asserting, *inter alia,* numerous claims of unlawful price discrimination occurring from 1965 through 1971, which allegedly resulted in substantial loss of sales volume and the collapse of Redel's business in 1971. Redel's thereupon sold its assets to another G.E. franchised dealer, prompting cancellation of Redel's franchise by G.E. In its answer to the complaint, G.E. set forth several affirmative defenses, the most significant for our purposes being the general release found in the 1969 franchise agreement. In support of its motion for partial summary judgment, G.E. contended, as it does now, that the release bars recovery by Redel's as to all liabilities which existed at the time the release was executed in March, 1969, and further, that when the 1971 addendum was executed, it, *ex proprio vigore,* renewed the March, 1969, agreement, thereby incorporating its general release and depriving the plaintiff of the right to litigate claims existing as of February 12, 1971. Apparently convinced that the addendum constituted a contract renewal, which somehow incorporated every provision of the 1969 franchise agreement, the district court agreed with G.E. and granted its motion.

### III.

### DISCUSSION

#### A. *Prospective Application of the General Release.*

■ It is beyond peradventure that the lower court committed grave error in holding that the general release found solely in the franchise agreement of March 3, 1969, was effective to bar Redel's claims through the date of execution of the addendum on February 12, 1971. The addendum was merely an addition to the franchise agreement, expressly anticipated by the parties to that agreement, which set forth the dealer's minimum retail sales requirement for 1971. Although the addendum would be interpreted in accordance with the provisions of the franchise agreement, it obviously did not, and was not intended to, renew the franchise agreement, which remained in full force and effect until terminated pursuant to its terms. The addendum certainly did not, as the district court erroneously concluded, effect a new release by Redel's of all claims existing against G.E. as of its date.

■ The question then becomes whether the general release provision contained in the franchise agreement operates prospectively. There are two answers, both of which conclusively deny prospective effect. The first is found in the language of the release itself: ". . . The Dealer hereby releases General Electric Company from all claims, demands, contracts, and liabilities, if any there be, as of the date of the execution of this agreement by the Dealer. . . ." The interpretation of any release of antitrust liability must be governed by the intent of the parties. This is the uniform federal rule derived from Aro Manufacturing Co. v. Convertible Top Co., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964), and Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).[2] Therefore, it must be conclud-

---

2. In these cases, the Supreme Court rejected the common law rule that the release of one joint tortfeasor operates to release all unless the instrument contains an express res-

ed from the unambiguous language drafted by G.E. that the parties did not intend the release to apply prospectively beyond the franchise agreement's execution date of March 3, 1969. Significantly, a contrary conclusion would likewise prevent prospective application since such application would run counter to public policy.

The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy. A right conferred on a private party by federal statute, but granted in the public interest to effectuate legislative policy, may not be released if the legislative policy would be contravened thereby.[3] Releases may not be executed which absolve a party from liability for future violations of our antitrust laws.[4] The Eighth Circuit explained this principle succinctly in Fox Midwest Theatres v. Means, 221 F.2d 173, 180 (8th Cir. 1955): "Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another

would to that extent be void as against public policy [Citation omitted]. This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well. Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract 'in restraint of trade.'" The Supreme Court in Zenith, supra, reiterated the underlying policy in stating that private antitrust suits are considered "one of the surest weapons for effective enforcement of the antitrust laws."[5] Therefore, as a matter of law, the general release in the case sub judice is ineffective to bar claims arising subsequent to March 3, 1969, the date of its execution.

### B. Retrospective Application of the General Release.

The foregoing analysis has, we think, correctly assumed that the retrospective proscription inherent in the release provision is itself valid. The language is unfettered by either patent or

ervation of rights against others. The Court held in essence that a release of a federally created statutory claim raises pervasive federal questions which should be determined by a uniform federal rule of construction rather than various state rules. It chose to adopt the modern rule that the consequences of the release are to be determined by the intention of the parties. The Zenith case extended the rationale of the Aro Manufacturing Co. case from the patent infringement area to the antitrust area. See Miami Parts & Spring, Inc. v. Champion Spark Plug Co., 402 F.2d 83 (5th Cir. 1968), and Cates v. United States, 451 F.2d 411 (5th Cir. 1971), predating and postdating Zenith respectively. The former held that federal rather than state law governs the effect of releases in federal antitrust actions, while the latter extended Zenith's application from federal statutory claims to federal question claims, such as maritime claims, where "policies and traditions are as readily identifiable." 451 F.2d at 415.

3. Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), and Midstate Horticultural Co. v. Pennsylvania R. Co., 320 U.S. 356, 361, 64 S.Ct. 128, 88 L.Ed. 96 (1943).

4. Lawlor v. National Screen Service, 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); Gaines v. Carrollton Tobacco Board of Trade, Inc., 386 F.2d 757 (6th Cir. 1967); Fox Midwest Theatres v. Means, 221 F.2d 173, 180 (8th Cir. 1955); Westmoreland Asbestos Co. v. Johns-Manville Corp., 39 F.Supp. 117, 119 (S.D.N.Y.1941), aff'd, 136 F.2d 844 (2d Cir. 1943); and Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F.Supp. 1019, 1022 (S.D.Tex.1972).

5. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 336, 91 S.Ct. 795, 805, 28 L.Ed.2d 77 (1971). See also, Lawlor v. National Screen Service, supra, 349 U.S. at 329, 75 S.Ct. 865, 99 L.Ed. 1122. In summarizing the legislative purpose in conferring a private right of action for treble damages, Judge Rives, in Kinnear-Weed Corp. v. Humble Oil and Refining Co., 214 F.2d 891, 893 (5th Cir. 1954), stated: "The grant of a claim for treble damages to persons injured was for the purpose of multiplying the agencies which would help enforce the antitrust laws and therefore make them more effective."

latent ambiguities. Redel's efforts to convince the Court otherwise are unpersuasive. It contends that the release is limited by language in the introductory paragraph of the franchise agreement which states: "The provisions of this agreement shall govern all contracts and transactions between the District and the Dealer during said term respecting such products." Redel's argument is that the instant complaint relates solely to transactions between G.E. and third parties, the third parties being those who allegedly benefited from unlawful price discrimination. However, the above recited language would never serve to govern the interpretation of the release, since, as previously observed, the release operates with respect to past conduct while the other provisions of the contract operate during a franchise term commencing at the date of execution.

Despite this Court's familiarity with applicable rules of construction which mandate narrow construction of general releases and resolution of ambiguities against the draftsman, they do not avail to assist Redel's in the circumstances before us. The language is unmistakably clear. Redel's, by and through its president, agreed to be bound by language which released G.E. from "all claims . . . and liabilities, if any there be, as of the date of the execution of this agreement. . . ."[6] The parties, in establishing their franchise relationship for an indefinite term, apparently desired to settle all matters that presented themselves in the context of their earlier series of relationships. Redel's assertion that the inclusion of the general release by G.E. was a breach of its duties as a fiduciary is plainly frivolous and fully capable of resolution by the district judge, without trial.[7] Redel's can

be allowed no escape for the failure of its highest officer to read language in the agreements he executed on behalf of the company.

■■ In the complete absence of ambiguity, the general release provision here permits no jury consideration of extrinsic evidence as to its scope. Liabilities arising from facts occurring prior to March 3, 1969, are effectively barred by the release. However, it should not be concluded that this Court condones the use of the general release as a device to immunize parties with superior economic power from the penalties and restraints imposed by the enforcement of our antitrust laws. There are two policies which must be accommodated. The first requires the greatest respect for private enforcement as the hallmark of the federal antitrust regulatory system. The second policy requires us to respect the amicable settlement and release of antitrust claims by the parties themselves.[8] Where these policies are brought into conflict, the first must prevail. The Court is wary of the problem noted by Judge Winter in his dissent to the majority opinion in Virginia Impression Products Co., Inc. v. SCM Corporation, 448 F.2d 262 (4th Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972), whereby the draftsman of a general release fails to disclose to the releasing party the factual predicate for an antitrust claim or indeed, the fact that antitrust claims are even embraced by the release, and thus attempts forever to bar the unsuspecting victim of antitrust violations from his statutorily granted recourse to the federal courts. Although absent here, similar controversies may well set forth facts which require jury consideration of claims that the release itself

6. This language, without more, permits the intent of the parties as to the scope of the release to be readily ascertained without submission to the trier of fact. *Cf.* Novak v. General Electric Corporation, 282 F.Supp. 1010, 1023 (E.D.Pa.1967).

7. "The purpose of the [summary judgment] rule is to preserve the court from frivolous

defenses. . . ." Fidelity & Deposit Co. of Maryland v. United States, 187 U.S. 315, 320, 23 S.Ct. 120, 122, 47 L.Ed. 194 (1902).

8. See, *e. g.*, S. E. Rondon Co. v. Atlantic Richfield Co., 288 F.Supp. 879 (C.D.Cal. 1968).

was an integral part of a scheme to violate the antitrust laws.[9] While not an absolute requirement, antitrust policy certainly encourages the parties to a general release to evidence their intention to release antitrust claims.

## IV.

## CONCLUSION

The general release executed on March 3, 1969, operates retrospectively and does not, through the use of an addendum, operate prospectively. Therefore, the judgment of the district court is affirmed in part and reversed in part, and the cause is hereby remanded to the district court for further proceedings not inconsistent herewith.

---

**9.** See Dobbins v. Kawasaki Motors Corp., 362 F.Supp. 54, 58 (D.Or.1973). The following language is illustrative: "I conclude a part and parcel argument may be used by a plaintiff to avoid a release in an antitrust action where it is shown that the release was an object of the combination or conspiracy or where it was an integral part of the scheme in restraint of trade. I find that those circumstances do not exist in the present case. There are no material factual issues with respect to the circumstances and events leading up to the release agreement between Dobbins and KMC. It does not appear that the release bore any integral relationship to the antitrust conduct complained of. Plaintiffs present no theoretical set of facts upon which a trier of fact could find a nexus between the release and the broader combination or contract prohibited by the Sherman Act." See also, Taxin v. Food Fair Stores, Inc., 287 F.2d 448, 451 (3d Cir. 1961); S. E. Rondon Co. v. Atlantic Richfield Co., *supra*, 288 F.Supp. at 882; California Concrete Pipe Co. v. American Pipe & Construction Co., 288 F.Supp. 823 (C.D. Cal.1968); and Carter v. Twentieth Century-Fox Film Corp., 127 F.Supp. 675 (W.D. Mo.1955).