915 F.2d 1566
 RICO Bus.Disp.Guide 7598
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Gary WELLS, Mtron, Inc., a Texas Corporation; Otron, Inc.,
a Texas Corporation, Plaintiffs-Appellants,
v.
ENTRE COMPUTER CENTERS, INC., a Delaware Corporation, Entre
Computer Centers of America, Inc., a Delaware
Corporation, Steven B. Heller, James J.
Edgette, Defendants-Appellees.
Gary WELLS, Mtron, Inc., a Texas Corporation; Otron, Inc.,
a Texas Corporation, Plaintiffs-Appellees,
v.
ENTRE COMPUTER CENTERS, INC., a Delaware Corporation, Entre
Computer Centers of America, Inc., a Delaware
Corporation, Defendants-Appellants,
and
Steven B. Heller, James J. Edgette, Defendants.
 Nos. 89-2342, 89-2352.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 4, 1989.
Decided Oct. 5, 1990.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Chief District Judge. (CA-88-1361-A)
 Edward A. McConwell, Law Firm of Edward A. McConwell, Overland Park, Kan., (Argued), for appellants; Clayton E. Dickey, Law Firm of Edward A. McConwell, Overland Park, Kan., on brief.
 Julia A. Dahlberg, Gibson, Dunn & Crutcher, Washington, D.C. (Argued), for appellees; Wesley G. Howell, Jr., Paul Blankenstein, John C. Millian, Gibson, Dunn & Crutcher, Washington, D.C., on brief.
 E.D.Va.
 No. 89-2342 AFFIRMED IN PART AND DISMISSED IN PART; No. 89-2352 AFFIRMED.
 Before DONALD RUSSELL, WIDENER and WILKINS, Circuit Judges.
 PER CURIAM:
 
 
 1
 This appeal arises from the purchase and subsequent failure of five retail computer store franchises. The franchisees--Gary Wells, Mtron, Inc., and Otron, Inc.--brought an action for fraud, breach of contract, RICO violations,[1] breach of fiduciary duty, and violation of the Texas Deceptive Trade Practices Act against the franchisor and two of its founders and directors--Entre Computer Centers, Inc., Entre Computer Centers of America, Inc., Steven B. Heller, and James J. Edgette.[2] The crux of the franchisees' suit is that the entire franchise relationship with Entre was permeated with fraud, mismanagement, and unfulfilled expectations.
 
 
 2
 More specifically, among other things the franchisees contend that Entre breached its contractual, statutory, and common-law duties to the franchisees by instilling a sense of urgency that did not exist, which caused Wells to open the five computer centers; by charging a higher price for products than its franchise development officer represented to Wells; by projecting unrealistically optimistic profit margins for the centers; and by failing to supply the centers with an adequate inventory.
 
 
 3
 The franchisees filed their original complaint in the United States District Court for the Eastern District of Texas. On defendants' motion, the Texas court transferred the case to the Eastern District of Virginia. The Virginia district court entered summary judgment for defendants, and the franchisees now appeal. We agree with the district court that the franchisees executed several valid contracts releasing defendants from liability for all claims asserted, and we affirm.
 
 I.
 
 4
 The scope of our review is identical to that of the district court. That is, we must affirm the district court's entry of summary judgment if there is no genuine issue as to any material fact, viewed in the light most favorable to the nonmoving party, here the plaintiff franchisees. Pulliam Investment Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir.1987). Because the district court based its ruling on the franchisees' execution of a number of general releases in favor of defendants, we will not recount the entire franchise relationship in great detail. We limit our factual discussion, therefore, to those events having a bearing on the validity of the releases in question.
 
 
 5
 Defendant Entre, a Delaware corporation with corporate headquarters in McLean, Virginia, franchises retail computer stores that specialize in the sale of personal computers and related equipment. In April 1983 plaintiff Gary Wells, a Texas citizen, entered into four separate franchise agreements with Entre for the establishment of Entre Computer Centers in Little Rock, Arkansas; San Antonio, Texas; Austin, Texas; and Oklahoma City, Oklahoma. In May 1983 Wells and other investors incorporated plaintiff Mtron, Inc. under the laws of Texas for the purpose of owning and operating some of the computer centers.
 
 
 6
 Under the franchise agreements, Wells could not transfer the franchises without Entre's prior written consent. The franchise agreements also contained several conditions that had to be met before Entre would agree to a transfer, one of which was the transferor's execution of a general release in favor of Entre. Therefore, in early June 1983 Wells executed the first of a series of general releases in favor of Entre in exchange for Entre's consent for Wells to transfer the four franchises to Mtron.
 
 
 7
 Mtron and Entre entered into a franchise agreement in late June 1983 for a fifth center to be located in Tulsa, Oklahoma. In late August 1983 Wells and the same group of investors formed a second corporation, Otron, Inc., again under the laws of Texas, for the purpose of owning and operating the Tulsa franchise. In December 1983 Entre consented to the transfer of the Tulsa franchise from Mtron to Otron, in exchange for Mtron's execution of a general release in favor of Entre.
 
 
 8
 By late 1984, each of the five centers was losing a substantial amount of money. Richard Vaughan, one of the original investors who had succeeded Wells as president of Mtron and Otron, decided to sell the centers. Accordingly, Mtron reached an agreement to sell the Little Rock franchise to Evergreen Investors, Inc. In exchange for Entre's consent to the transfer, Mtron in December 1984 executed another general release in favor of Entre. That same month Mtron agreed to sell the Austin franchise to Gratz & Games, Inc. and executed the customary release in exchange for Entre's consent to the transfer.
 
 
 9
 In January 1985 Mtron agreed to sell the San Antonio center to a new Entre subsidiary, Entre Computer Centers of San Antonio, Inc. The purchase agreement contained another general release in favor of Entre. Also in January 1985, Entre terminated Mtron's rights as franchisee of the Oklahoma City center.
 
 
 10
 Finally, in March 1986 Otron executed the last general release in favor of Entre and Entre of America in exchange for Entre's consent for Otron to sell the only remaining franchise, the Tulsa center, to Precision Industries, Inc. Wells, Mtron, and Otron filed suit against Entre in August 1987 in the United States District Court in Sherman, Texas. In the interest of clarity, we summarize in the following tables the information set forth above:
 
 
 11
 Franchise 1st Franchisee 2d Franchisee 3d Franchisee
Little Rock Wells Mtron Evergreen Investors
 (April 1983) (June 1983) (December 1984)
San Antonio Wells Mtron Entre of San Antonio
 (April 1983) (June 1983) (January 1985)
Austin Wells Mtron Gratz & Games, Inc.
 (April 1983) (June 1983) (December 1984)
Oklahoma City Wells Mtron [terminated 1/21/85]
 (April 1983) (June 1983)
Tulsa Mtron Otron Precision Industries
 (June 1983) (December 1983) (March 1986)
Release Date Made by Given to
Release No. 1 June 1983 Wells Entre, Inc.
Release No. 2 December 1983 Mtron Entre, Inc.
Release No. 3 December 1984 Mtron Entre, Inc.
Release No. 4 December 1984 Mtron Entre, Inc.
Release No. 5 January 1985 Mtron Entre, Inc.
Release No. 6 March 1986 Otron Entre of America and Entre, Inc.
 
 II.
 
 12
 At the outset, the franchisees contend that the Texas court erred in transferring their action to Virginia. They assert that, although the franchise agreements contain a forum selection clause designating Virginia as the forum for any action between the parties, other factors relevant to the district court's decision did not support a transfer. We are, however, without jurisdiction to review this assignment of error.
 
 
 13
 We have recognized that we have no jurisdiction to review a decision to transfer venue rendered by a district court in another circuit. Linnell v. Sloan, 636 F.2d 65, 67 (4th Cir.1980). To vest this court with jurisdiction to review the transfer, the franchisees would have to have moved in the transferee court, the Eastern District of Virginia, for retransfer of their action (which was not done), and sought review of any denial of such motion. Linnell, 636 F.2d at 67. We decline to reexamine the rationale of Linnell.[3]
 
 III.
 
 14
 In addition to a forum selection clause, the franchise agreements also contain a choice of law provision, which provides that "[t]his Agreement takes effect upon its acceptance and execution by Franchisor in Virginia, and shall be interpreted and construed under the laws thereof, which laws shall prevail in the event of any conflict of law." Based upon this language, Entre contends that, even if Texas choice of law rules apply because the action originally was filed there, see Van Dusen v. Barrack, 376 U.S. 612, 639 (1964), Virginia law still governs the construction and validity of the releases because Texas choice of law rules would give effect to the contractual choice of law provision. See First Commerce Realty Investors v. K-F Land Co., 617 S.W.2d 806, 808-09 (Tex.Civ.App.1981).
 
 
 15
 The franchisees claim that the choice of law provision contained in the franchise agreements applies only to disputes involving the terms of those agreements, and not to disputes over the releases, which include no choice of law provision. Moreover, the franchisees assert that, even if Virginia law applies, under Virginia law the place of the execution of a release governs the validity of a release, see Corbett v. Bonney, 121 S.E.2d 476, 479 (Va.1961), and therefore Texas law governs.
 
 
 16
 The parties apparently agree that the only significant difference between Texas and Virginia law, for purposes of this case, is that the franchisees would have to establish fraud by clear and convincing evidence under Virginia law, but only by a preponderance of the evidence under Texas law. Compare Nationwide Mut. Ins. Co. v. Muncy, 234 S.E.2d 70, 72 (Va.1977), with Johnson v. State Farm Mut. Auto. Ins., 762 S.W.2d 267, 270 (Tex.Ct.App.1988) (jury instruction). The district court did not indicate in its oral ruling which law it applied, or which burden of proof the franchisees failed to meet. We believe the franchisees fell far short of producing evidence tending to establish an issue of fact as to fraud or duress under even a preponderance standard, however, and therefore we think it makes no difference which state's law we apply. Thus, we also do not expressly decide the choice of law issue, but will apply the law the franchisees prefer, Texas law, where that law appears more favorable.
 
 IV.
 
 17
 The franchisees advance numerous grounds for avoiding the effect of the releases. First, the franchisees challenge the scope of the releases. That is, they assert that, even if the releases are otherwise valid, they do not by their terms cover every claim that each franchisee has asserted with respect to all named defendants. We disagree.
 
 
 18
 The language in the releases is the all-encompassing boilerplate that lawyers have used for generations, exactly because it has been proven effective. For example, the first and second releases, which Wells executed on behalf of himself and on behalf of Mtron, released Entre
 
 
 19
 from and against any and all claims arising out of, or incident to, the execution of, and performance of the terms, conditions, obligations and stipulations contained in, the said franchise agreements ... including, without limitation, claims arising under federal, state and local laws, rules and ordinances.[4]
 
 
 20
 The third, fourth, and sixth releases, signed by Mtron and Otron, were even broader:
 
 
 21
 [The franchisee] hereby releases and forever discharges Entre, and Entre's successors, representatives, agents, officers, directors, shareholders, and employees, and each of them, of and from any claims, debts, liabilities, demands, obligations, costs, expenses, actions, and causes of action of any nature, character, or description, known or unknown, vested or contingent, which ... all above-referenced persons now own or hold or have at any time heretofore owned or held, or may at any time own or hold against Entre arising prior to and including the date of this General Release.
 
 
 22
 The fifth release, which Mtron executed in connection with the sale of the San Antonio center, contained similar language.
 
 
 23
 The franchisees contend that, because they executed each release in exchange for Entre's consent to the transfer of a specific center (or in the case of the San Antonio center in exchange for Entre's purchase of the center), each release relinquished only those claims that related to the operation of the named center. If the releases applied to claims relating to other centers, argue the franchisees, Entre would have had no need to obtain a separate release in conjunction with each transfer. The argument continues that, because none of the releases refer to the Oklahoma City franchise, which Entre terminated in January 1985, none of the claims with respect to the Oklahoma City center are barred.
 
 
 24
 We believe the franchisees confuse the consideration supplied for the releases with the releases' effect. Though not every one of the releases is captioned "general release," each contains language that unambiguously indicates an intent to release Entre from all potential claims, not just claims with respect to a particular center. Entre's reason for requiring an additional general release for each transfer probably related to one of the franchisees' other arguments--the releases by their own terms do not extend to claims that might arise in the future. See, e.g., Starcraft Co. v. C.J. Heck Co., 748 F.2d 982, 988 n. 7 (5th Cir.1984). Thus, while each release relinquished all claims presently then existing against Entre, an additional release in conjunction with each transfer provided added protection against claims that arose after the date of the last release.
 
 
 25
 All of the franchisees' claims arise out of the franchise relationship. Therefore, the claims necessarily are predicated upon events that occurred before or during the time the franchisees had rights under the franchise agreements. As set forth in the tables above, each franchisee executed a general release at the same time it transferred its rights under the various franchise agreements. As set forth in the tables above, each franchisee executed a general release at the same time it transferred its rights under the various franchise agreements. Because the last release each franchisee executed coincided with the termination of that franchisee's relationship with Entre, we agree with the district court that the releases cover all of the franchisees' claims.[5]
 
 V.
 
 26
 Even if the releases by their terms extend to all claims against all defendants, the franchisees advance five grounds that, they argue, render the releases ineffective: the releases are voidable because a fiduciary relationship existed between the parties; Entre procured the releases through duress or by virtue of disparate bargaining power; enforcement of the releases would be unconscionable; the releases were part and parcel of a RICO conspiracy; and the releases were not supported by consideration. We find no merit in any of these arguments.
 
 
 27
 As for the franchisees' allegation of a fiduciary relationship, the franchisees know of no Texas case that has recognized a fiduciary relationship in the franchise context, and Virginia law is contrary to their position. See Picture Lake Campground, Inc. v. Holiday Inns, Inc., 497 F.Supp. 858, 869 (E.D.Va.1980).[6] Instead, the franchisees rely extensively on a laundry list of Entre's rights and their own obligations under the franchise agreements, which they argue tends to establish the one-sidedness of the relationship and demonstrate the confidence and trust they reposed in Entre. The lack of weight of such evidence, however, is directly shown not only by the common understanding of a franchise relationship, but by other provisions of the franchise agreements themselves.
 
 
 28
 For example, section XVII of the agreements states: "It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them, that Franchisee shall be an independent contractor...." Similarly, in section XXIII of the agreements, each franchisee acknowledged
 
 
 29
 that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent businessman.
 
 
 30
 We agree with the district court that the franchisees failed to establish a triable issue of fact as to the existence of a fiduciary relationship between the parties.
 
 
 31
 We also reject the franchisees' theories of duress, disparate bargaining power, and unconscionability, for much the same reason. To void the releases on the ground of duress or disparate bargaining power, the franchisees must establish "that a wrongful threat was made which was of such character as to destroy the free agency of the party to whom the threat was directed." Palmer Barge Line, Inc. v. Southern Petroleum Trading Co., 776 F.2d 502, 505 (5th Cir.1985). The Palmer court further noted that "[a]lthough duress is difficult to prove, a showing of imminent financial distress coupled with the absence of any reasonable alternative to the terms presented by the wrongdoer may be sufficient to establish economic duress." Id. Similarly, to invalidate the releases as unconscionable, the franchisees must demonstrate that Entre's procurement of the releases
 
 
 32
 (A) [took] advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or
 
 
 33
 (B) [resulted] in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.
 
 
 34
 Tex.Bus. & Com.Code Sec. 17.45(5).
 
 
 35
 The franchisees assert that the financial condition of the centers at the time most of the releases were executed left the franchisees with a Hobson's choice: either sign the releases and thereby obtain permission to transfer the failing businesses, or keep the businesses and any claims against Entre while continuing to lose money every month. We believe that, even if the franchisees found themselves in such a situation, that provides no basis for voiding the releases.
 
 
 36
 Even assuming their portrayal of the dire financial condition of the centers is correct,[7] the franchisees had expressly agreed in the franchise agreements, at a time when they were under no financial distress whatsoever, that they would not transfer the businesses without Entre's consent, and that Entre had the right to condition its consent on the execution of a general release in Entre's favor. Thus, Entre made no wrongful threat that destroyed the franchisees' free agency; Entre only required the franchisees to do what they already had agreed to do.
 
 
 37
 Similarly, we do not believe enforcement of the releases would be unconscionable. As the district court recognized, the franchisees are sophisticated businessmen who invested a six-figure sum to acquire and operate five new businesses. If the franchisees objected to certain provisions of the franchise agreements, they could have chosen not to sign them. The businesses' subsequent failure, a prospect the franchisees explicitly acknowledged at the outset, as mentioned before did not render unconscionable either the agreements or the releases.
 
 
 38
 We also find that Entre's consent to transfer the centers (in the case of the San Antonio center Entre's purchase of the center) was adequate consideration for the releases. Each release recited the consideration supplied, and " 'any amount, however slight, will be sufficient if it was accepted or agreed to by the person executing the release.' " Buddy "L," Inc. v. General Trailer Co., 672 S.W.2d 541, 547 (Tex.Ct.App.1984) (quoting Texarkana Nat'l Bank v. Hubbard, 114 S.W.2d 389, 392 (Tex.Civ.App.1938)).
 
 
 39
 Finally, the franchisees argue that the releases are void because they were part and parcel of a RICO conspiracy. In support of this proposition, the franchisees cite two Fifth Circuit cases that enforced releases over arguments that the releases were part and parcel of an antitrust conspiracy. See Ingram Corp. v. J. Ray McDermott & Co., 698 F.2d 1295 (5th Cir.1983); Redel's, Inc. v. General Electric Co., 498 F.2d 95 (5th Cir.1974). The Fifth Circuit did not adopt the franchisees' part and parcel theory, however, but only stated that "another case may someday arise where 'the release itself was an integral part of a scheme to violate antitrust laws' and therefore will not be construed to extinguish antitrust claims." Ingram, 698 F.2d at 1315 (quoting Redel's, 498 F.2d at 100-01). Moreover, the Fifth Circuit made the latter observation in the antitrust context, not in the context of RICO. Defendants argue that real doubt exists as to whether the franchisees have even stated a claim under RICO. We do not decide the question, however, for it is enough to say that, whether or not a future case may provide an opportunity for a court to invalidate releases on the ground that they were an integral part of a RICO conspiracy, "[t]his case has not ushered in that day." Ingram, 698 F.2d at 1315.
 
 VI.
 
 40
 To summarize, we find that this court has no jurisdiction to review the Texas district court's decision to transfer venue; that the district court properly denied Entre's counterclaim for breach of the forum selection clause; that the releases extend to all claims asserted as to all defendants; that the franchisees executed the releases knowingly and voluntarily, in accordance with the provisions of the franchise agreements; and that the franchisees' grounds for avoiding the releases--the existence of a fiduciary relationship, duress or disparate bargaining power, unconscionability, lack of consideration, or a RICO conspiracy--are meritless.
 
 
 41
 So far as the appeal in No. 89-2342 relates to an appeal from the order of the Texas district court transferring the case to Virginia, the appeal is dismissed. The balance of the judgment of the district court in case No. 89-2342 is affirmed.
 
 
 42
 The judgment of the district court in case No. 89-2352, the cross appeal, is affirmed.
 
 
 43
 No. 89-2342, AFFIRMED IN PART AND DISMISSED IN PART.
 
 
 44
 No. 89-2352, AFFIRMED.
 
 
 
 [1]
 The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961-68
 
 
 [2]
 The franchisees alleged in their complaint, and all parties have treated as correct until now, that on January 1, 1985, Entre Computer Centers of America, Inc., a wholly owned subsidiary of Entre Computer Centers, Inc., assumed the parent company's duties as franchisor with respect to domestic operations. The franchisees now assert, based on a document contained in the joint appendix, that the transfer of responsibility occurred on September 1, 1984. If that be true, assert the franchisees, Entre of America's relationship would have extended to three centers whose franchisee never released Entre of America from liability. See infra note 5. Because such a change in theory would at this stage have to be treated as a concession improvidently made, which we do not do, we assume that January 1, 1985, is the correct date. Defendants Heller and Edgette founded Entre Computer Centers, Inc. and served on its board of directors until late 1988. Hereafter, we may refer to defendants collectively as Entre
 
 
 [3]
 Entre cross-appeals from the district court's dismissal, for failure to state a claim upon which relief can be granted, of its counterclaim for damages based on the franchisees' breach of the forum selection clause. Entre knows of no case, however, nor do we, in which a court has awarded damages because a plaintiff brought suit in a forum other than the one to which it had contractually agreed, and we find the cross-appeal to be without merit
 
 
 [4]
 The franchisees' own counsel drafted the first and second releases, a fact which, though not dispositive, certainly militates against their theories of duress and unconscionability
 
 
 [5]
 We also reject the franchisees' assertion that the releases do not extend to Heller, Edgette, or Entre Computer Centers of America, Inc. because those defendants are not specifically named in all the releases. As to Heller and Edgette, a release need only identify a potential tortfeasor "with such descriptive particularity that his identity or his connection with the tortious event is not in doubt." Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 420 (Tex.1984). Although Heller and Edgette are not identified by name, the releases refer to Entre's directors, a readily identifiable group of which Heller and Edgette were two. With respect to Entre of America, although three of the Mtron centers went out of business just before Entre of America took over, it appears that only one franchise, the Tulsa center which Otron owned, was still in business when Entre of America assumed Entre's duties as franchisor. Because Otron was also the one franchisee whose release specifically named Entre of America, the franchisees' attempt to separate Entre of America from the parent company is without merit
 
 
 [6]
 The choice of law provision of the agreements provides for Virginia law, whatever the forum may be
 
 
 [7]
 Mtron executed a release in December 1984 in exchange for Entre's consent for Mtron to sell the Little Rock center to Evergreen Investors, Inc. The release was executed by Richard Vaughan, the president of Mtron and Otron who has stated that "there was no reasonable conclusion but to sell the centers" because "Mtron and Otron would continue to lose money each month...." Curiously, the owners of Evergreen, the entity which purchased the failing center from Mtron, included not only Vaughan but two other shareholders of Mtron