**MR. STEAK, INC., Plaintiff-Appellant,
Cross-Appellee,**

v.

**RIVER CITY STEAK, INC., Defendant-
Appellee, Cross-Appellant.**

**Nos. 71–1222, 71–1223.**

United States Court of Appeals,
Tenth Circuit.

May 16, 1972.

Sanford B. Hertz, Denver, Colo. (Robert W. Hite, Denver, Colo., on the brief), for appellant.

Robert S. Wham, Denver, Colo. (Joffre M. Johnson and Schneider, Shoemaker, Wham & Cooke, Denver, Colo., on the brief), for appellee.

Before MURRAH, SETH, and BARRETT, Circuit Judges.

SETH, Circuit Judge.

This diversity action was brought by Mr. Steak, Inc., against River City Steak, Inc., in United States District Court for the District of Colorado, for breech of a franchise agreement, a sublease agreement, and an equipment lease agreement. The defendant filed a counterclaim based on fraud and other grounds. The case was tried to a jury which found for defendant on its counterclaim in full. The trial court however ordered a remittitur on the ground defendant had received certain benefits it should return since it had elected to rescind.

The parties executed a contract by which defendant was sold by plaintiff a franchise to operate a Mr. Steak restaurant in Sharon, Pennsylvania. Once the franchise agreement was executed, plaintiff sublet the real estate it had leased for the site to the defendant for the same rental it was paying. A third instrument provided for the leasing to defendant of all the equipment necessary in its restaurant.

Defendant opened the Sharon restaurant under this arrangement in November 1968 and closed it due to lack of business in September 1969. Mr. Steak then brought this action, alleging that defendant had breached all three "contracts." The complaint listed defendant's failure to keep various insurance policies in force, failure to pay certain of its bills, failure to pay Mr. Steak its agreed-upon percentage of gross sales, and failure to pay the rent due under its sublease during the period of June–September 1969. The complaint alleged also that defendant failed to make its equipment rental payments over this same four month period. Relying on acceleration clauses present in the sublease agreement and the equipment lease agreement, Mr. Steak sought damages.

The defendant below counterclaimed for rescission of its contract alleging that Mr. Steak breached the franchise agreement, breached its fiduciary duty to defendant, perpetrated common law fraud against it, and violated federal and Colorado security laws. Prior to trial, the court dismissed defendant's claim of security law violations, 324 F. Supp. 640. The case was tried to a jury of six, and a verdict was returned for defendant in the amount of $35,000 on its counterclaim. The court, on plaintiff's motion, however, granted a partial remittitur of all sums in excess of $20,121.

Plaintiff-appellant appeals from the verdict of the jury and the refusal of the trial court to grant full remittitur or, alternatively, for a new trial. Defendant-appellee argues in support of the jury's verdict, and cross-appeals from the partial remittitur granted by the court below and from the court's dismissal of a portion of its counterclaim

based on violation of State and federal security laws by plaintiff.

Plaintiff contends that the trial court committed error in refusing to direct a verdict in its favor at the close of all the evidence. On this issue, the federal standard is applicable, as we said in Chicago, Rock Island & Pacific R. R. v. Howell, 401 F.2d 752 (10th Cir.):

> "Under the federal rule a directed verdict is authorized only when the evidence is all one way or so overwhelmingly preponderant in favor of the movant that the trial court in the exercise of its sound discretion would be required to set the verdict aside."

See also Smith v. Mill Creek Court, 457 F.2d 589 (10th Cir.). To apply this standard we have examined the evidence which had been introduced. The forum state was Colorado, and there the place where the contract was made governs its nature, validity, and interpretation. Kloberdanz v. Joy Mfg. Co., 288 F.Supp. 817 (D.Colo.1968); Carlson v. Boryla, 490 P.2d 700 (Colo.App.1971). The several contracts were executed in Colorado.

The basis of defendant's counterclaim was the assertion that the contracts were induced by fraud on the part of plaintiff, that the contracts should be rescinded, and both parties returned to their former positions. Defendant made an election to rescind at the close of the evidence. Under Colorado law rescission is an available remedy where a contract is induced by fraud. Nichoalds v. McGlothlin, 330 F.2d 454 (10th Cir.). The Colorado Supreme Court set out the criteria for actionable fraud in Morrison v. Goodspeed, 100 Colo. 470, 68 P.2d 458, which are the traditional elements. See also Bemel Associates, Inc. v. Brown, 164 Colo. 414, 435 P.2d 407.

Our examination of the record leads us to the conclusion that the elements of fraud under the applicable law were established; thus the evidence relating to the counterclaim was sufficient indeed to cause the trial court to properly refuse to direct a verdict for plaintiff at the close of all the evidence. The plaintiff-appellant also asserts that its motion at the close of all the evidence to dismiss the common law fraud allegation should have been granted as the court erred in instructing the jury on the issue of fraud. As indicated above, there was ample evidence to warrant the court both in its denial of the motion to dismiss the fraud "allegations" and in submitting the fraud issue to the jury. The same conclusion must be reached as to the post-trial motions made by the plaintiff on the same issues.

The plaintiff-appellant also urges that it was error to refuse to grant a new trial or to grant full remittitur. These points are also based upon the same argument relating to proof which we have considered above, and we reach the same conclusion as to them.

### The Cross-Appeal

The defendant-appellee argues on cross-appeal that the trial court erred in granting plaintiff's motion to amend the jury's verdict and granting a remittitur of all amounts in excess of $20,121. The defendant was, of course, presented with the alternative of a new trial on the counterclaim. In response, plaintiff-appellant contends that the court should have granted it a full remittitur, minus the amounts attributable to deficiencies in the parking lot and landscaping, or, alternatively, that a new trial should have been granted.

In granting the partial remittitur of all amounts above, $20,121, the court reasoned that certain amounts must be subtracted from the $35,000 judgment won by defendant-appellee, due to the fact that "the jury made no allowance for return of the consideration paid by plaintiff on behalf of defendant under said contracts." And the trial court said: "That the verdict returned by the jury was the result of a misunderstanding or a misapprehension of the law

and therefore cannot stand in its present amount." The court also found that:

"The evidence clearly established that plaintiff paid out the following sums on behalf of defendant:

| | |
|---|---:|
| Rent (stating period) | $ 7,200 |
| Equipment Rental (stating period) | 2,600 |
| Advertising | 138 |
| Tax | 53 |
| Inventory | 1,342 |
| Miscellaneous | 3,546 |
| Total | $14,879" |

■ In its consideration of the remittitur, the trial court stated that the contracts are to be considered *void ab initio*, and each party should be placed in the position it occupied before making the contracts. The tabulation above of amounts "paid out" on behalf of defendant is what appeared in the trial court's order on remittitur. The two substantial items of "Rent" in the amount of $7,200 and "Equipment Rental" of $2,600 arose under the several related documents considered hereinabove, as did the item of $138 for insurance. On the record before us it does not appear that the others so arose directly. If these three items were induced by fraud as the jury found, obligations arising under them to plaintiff should not be considered a "benefit" received by the defendant under the Colorado authorities relating to rescission as cited by the trial court. These include Fidelity Finance Co. v. Groff, 124 Colo. 223, 235 P.2d 994 and Bankers Trust Co. v. Hall, 116 Colo. 566, 183 P.2d 986. The obligations were, as indicated, to plaintiff and used by it to reimburse itself for rent due and paid by it to others. This obligation over is not a factor to dictate a different result. We thus hold that the remittitur was excessive by the total of these three items, $9,938.

In so holding, we consider the issue to be properly raised in view of plaintiff's point on its appeal relative to the remittitur.

■ The final question on this appeal concerns the ruling of the trial court on the portions of defendant's counterclaim which asserted that the franchise it purchased was a "security" as defined under the Securities Act of 1933 [15 U.S.C. § 77a et seq.] and under the Colorado Securities Act [C.R.S. 1963, 125–1–12(12)]. The portions of the counterclaim based on such a contention were dismissed by the trial court. The trial court wrote a memorandum on the question as raised on motion which in our opinion thoroughly covers the issue and we can add little, if anything, to it.

In summary, this memorandum states as to the franchise agreement that Mr. Steak does not retain the right to direct the daily operations of the restaurant although it does have a right to see that certain standards are met. These are requirements as to insurance, products, uniforms, training, and restrictions on sale. The trial court points out that the relationship is to be examined on the basis of what the agreements permitted the defendant to do and not what it actually did in the way of supervision and management. The franchise provisions relating to the manager of the restaurant are the ones about which much of the disagreement centers. The contract provides that the franchisee, or Mr. Steak if the former fails to act, can select the manager. His salary is specified and he is required to invest in franchisee's stock. Mr. Steak had the power to supervise his activities, and, if the manager does not comply with their requests, Mr. Steak may discharge him and it alone select another manager. Mr. Steak under the agreement also pays all the accounts of the restaurant from its bank account and maintains all inventory controls. The trial court considering these factors said in part:

"Both the franchise agreement and the restaurant manager's agreement contemplated that River City Steak would play an active, if severely circumscribed, role in the conduct of the restaurant. It is also evident that

neither a manager nor subsidiary personnel could be totally unresponsive to River City Steak, which had the power to terminate their employment. In fact, a reading of both contracts suggests to us that the role of the franchisee was envisioned as a flexible one, depending upon the business expertise and inclination of the franchisee. Most duties mentioned in the franchise agreement could be performed by the franchisee, or delegated to the manager. That River City Steak delegated performance of those duties and ignored daily operations does not affect the nature of its powers, nor change the essential fact that River City Steak abandoned what rights of control and participation it did have.

"Considering the extent of River City Steak's financial participation in the restaurant, we find a situation fundamentally different from that present in both Howey and Continental Marketing. In the latter case, the investors were unfamiliar with raising beavers, and the cost of purchasing and housing them individually was prohibitive compared to the cost of contracting for their care. They were encouraged not to take possession of the beavers, and none in fact did. In Howey the Supreme Court noted that the purchasers are for the most part non-residents of Florida. They are predominantly business and professional people who lack the knowledge, skill and equipment necessary. * * * They are attracted by the expectation of substantial profits. 328 U.S. at 296, 66 S.Ct. 1100, 90 L. Ed. 1244.

"Here, in contrast, it does not appear that River City Steak was an uninformed investor. It was acquainted with the nature of the business it undertook. Even though a 'turn-key' operation was sold, it remained the sale of a business which the defendant could control and included the normal risks incident to operation of any enterprise. See Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969), where a similar 'turn-key' distributorship was held not to involve the sale of securities. River City Steak's financial participation was unlimited, and it remained liable for continuing operational expenses.

"Additionally, defendant has not endeavored to show that it was prevented from directing the operations of the restaurant or that it lacked the requisite knowledge, skill or expertise to undertake that task. Defendant here bought the 'chance to make a great deal of money,' but only if it could successfully operate the restaurant. Roe v. United States, 287 F.2d 435, 439 (5th Cir. 1961); Continental Marketing Corp. v. S. E. C., supra, citing Roe. We contrast the usual investor-promoter situation, where the skill or ingenuity of the investor does not determine the success or failure of the venture and where the investor's fortunes parallel those of the promoter, to the present situation, where River City Steak's enterprise stands or falls independently of Mr. Steak's success or failure. See, e. g., S. E. C. v. W. J. Howey Co., supra; Continental Marketing Corp. v. S. E. C., supra; Farrell v. United States, 321 F.2d 409 (9th Cir. 1963); Roe v. United States, supra; Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953); Penfield Co. of California, 143 F.2d 746 (9th Cir. 1944); S. E. C. v. Universal Service Ass'n, 106 F.2d 232 (7th Cir. 1939); S. E. C. v. MacElvain, 299 F.Supp. 1352 (M.D.Ala.1969). To characterize the contracts which create this relationship as a security would work an unwarranted extension of the Securities Act of 1933."

The trial court on this point also considered a "risk capital" argument derived from Securities & Exchange Comm'n v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, and Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 361 P.2d 906. The trial court concluded, and we agree, that the facts, especially the financial posi-

tion of Mr. Steak, do not warrant the application of such a doctrine. Thus we hold that the trial court correctly dismissed the counterclaim counts based on the application of the securities acts.

The case is affirmed except as to the modification of the remittitur described herein.