**C. Roger YOUMANS, Jr., M.D., and Leonard B. Tatar, Trustee, Plaintiffs-Appellants,**

v.

**Nick SIMON and Bidco, Inc., Defendants-Appellees.**

No. 85–2428.

United States Court of Appeals, Fifth Circuit.

June 6, 1986.

Rehearing and Rehearing En Banc Denied July 17, 1986.

Charles W. Getman, Robert N. Hinton, Alan N. Magenheim, Houston, Tex., for plaintiffs-appellants.

J. Eric Toher, Wright & Patton, William E. Wright, Houston, Tex., for Nick Simon.

Before WILLIAMS, GARWOOD and JONES, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellants C. Roger Youmans and Leonard B. Tatar entered into several real estate ventures with appellees Nick Simon and Bidco, Inc. These projects subsequently floundered resulting in large financial losses to the appellants. Youmans and Tatar sought to recover their losses from appellees in an action filed in federal district court. Youmans and Tatar alleged violations of the federal securities laws as well as violations of the civil liability provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*

Appellees moved for summary judgment on the grounds that none of their transactions with appellants involved securities and that the conduct alleged by appellants did not satisfy the elements of a civil RICO claim. The district court granted their motion and dismissed appellants' complaint. Youmans and Tatar now appeal the dismissal.

## I. FACTS

Youmans is a physician who resides in Galveston County, Texas. In 1974, Youmans participated in a limited partnership managed by Joel P. Simmons. This business venture appears to have been to Youman's satisfaction because he maintained a good working relationship with Simmons over the next several years. In 1977, Simmons introduced Youmans to appellee Nick Simon. Simon was a Houston area contractor. At the time, he and Simmons were organizing several real estate projects throughout Texas. Some of these projects were being organized through Bidco, Inc., a Texas corporation owned and controlled by Simmons and Simon. Simmons and Simon sought to attract Youmans to invest in some of these projects. Through Youmans, Simon and Simmons also met Leonard B. Tatar, the trustee of a fund established for the benefit of Youmans' children. Youmans and Tatar, as trustee, proceeded to invest in several projects organized by Simon, Simmons, and Bidco over the next several years as set out below.

In November 1977, Tatar invested $6,500 in cash on behalf of the trust in one of these projects, the Bidco-Tomball Joint Venture in Tomball, Texas. This investment bought a seven percent equity interest in the project. The joint venture agreement called for Bidco to serve as the Managing Venturer and Simon as the Development Manager. In June 1978, Youmans also entered into a real estate project being organized by Simmons and Simon. For $22,000, Youmans received a seven percent equity interest in the Dickinson Apartment Project Joint Venture in Dickinson, Texas. Simmons was the Managing Venturer and Simon the Developer of that project.

In August 1979, Youmans bought interests in several other Texas real estate projects from Simon, Simmons, and Bidco. In return, consideration consisted of promissory notes in the amount of $600,000 executed by Bidco and personally guaranteed by Youmans. In May 1981, Youmans purchased from Simon, Simmons, and Bidco additional interests in more real estate ventures, including a fifteen percent equity interest in the Bidco-Tomball venture. In consideration for these additional interests, Youmans secured and personally guaranteed a loan of $192,811 for the sellers. In May 1981, Youmans secured and guaranteed another loan in the amount of $192,-811 for the sellers in exchange for which he received an undivided 10.416 percent equity interest in the Bidco-West Chase Office Building, Limited. Youmans' and Tatar's

participation in each of these projects never exceeded a fifty percent equity interest.

Appellants' suit against Simmons, Simon, and Bidco claimed violations of §§ 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77l & 77q, and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j. Appellants also complained of civil RICO violations, 18 U.S.C. § 1961 *et seq.* Additionally, appellants claimed various pendent state causes of action.

Appellants alleged that many of the real estate projects had failed financially and appellants had lost substantial amounts of the money they had invested in them. Appellants also alleged that Simon, Simmons, and Bidco sold the joint venture's interest in the Bidco-Tomball project without informing appellants and without distributing to them the proceeds of the sale. Youmans was also forced to pay large amounts of money on the promissory notes and loans he had guaranteed on behalf of Simon, Simmons, and Bidco. Appellants contended that except for material omissions and misrepresentations made by the appellees and Simmons, they would not have invested in any of these projects.

Appellees filed a motion for summary judgment or, in the alternative, for dismissal for lack of subject matter jurisdiction. Appellants then moved pursuant to Fed.R.Civ.P. 15(a) for leave to file their first amended complaint. The district court denied this latter motion. Shortly thereafter, the district court approved of an agreed final judgment between appellants and Simmons. Under its terms, judgment in favor of the appellants was awarded in the amount of $469,500, plus interest and half of the court costs incurred. The district court then severed the claims against Simmons from the lawsuit.

After entering this judgment, the district court granted appellees' motions for summary judgment and dismissed appellants' remaining claims. The district court found that the transactions at issue in this case were not securities within the meaning of the federal securities laws. The RICO claims were dismissed because appellees had not alleged any racketeering injury distinct from the injury resulting from the predicate acts. A motion pursuant to Fed.R.Civ.P. 59 for a new trial or in the alternative to alter or amend order and judgment was denied. Appellants now seek review of the district court's summary judgment and of the refusal to allow amendment of their complaint.

## II. WHAT IS A SECURITY?

We can affirm a decision on summary judgment only if we find that no issues of material fact existed and that the movant was entitled to judgment as a matter of law. *McCrae v. Hankins,* 720 F.2d 863, 865 (5th Cir.1983). In reviewing the record, all inferences to be drawn must be viewed in the light most favorable to the party opposing summary judgment. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Although summary judgment, if properly invoked, may advance the interest of our judicial system in many ways, it should, nonetheless, be cautiously and sparingly applied. *See Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300, 303 (5th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984).[1]

The determination of what is a "security" must begin with a review of the statutory language of the federal securities laws. The term security has the same meaning for purposes of both the 1933 Securities Act and the 1934 Securities Exchange Act. *Landreth Timber Co. v. Landreth* — U.S. —, — n. 1, 105 S.Ct. 2297, 2302 n. 1, 85 L.Ed.2d 692 (1985). The

---

**1.** We are puzzled at appellants' insistence, both in their briefs and at oral argument, that we apply the standard of *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), to decide this issue. Under that standard, we would have to reverse the dismissal of appellants' security law claims unless we were to find appellants' claims

"immaterial and made solely for the purpose of obtaining jurisdiction or ... wholly insubstantial and frivolous." *Id.* at 682, 66 S.Ct. at 776. Inasmuch as *Bell* concerns only the standard by which to review a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), however, it is inapplicable to this case.

1933 Securities Act definition encompasses a large number of financial instruments, and includes:

> ... any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate, or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1). Appellants contend that the transactions at issue in this case are investment contracts and thus securities within the meaning of the federal securities laws.

The term "security" has been interpreted broadly, encompassing unusual financial instruments as well as these commonly considered to be securities. *Marine Bank v. Weaver,* 455 U.S. 551, 555, 102 S.Ct. 1220, 1222, 71 L.Ed.2d 409 (1982); *Tcherepnin v. Knight,* 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967). The "investment contract" has been one of the means employed to bring "instruments of 'more variable character'" within the scope of the federal securities laws. *Landreth,* — U.S. at —, 105 S.Ct. at 2302, *quoting SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943).

Within the scope of the investment contract are included financial instruments that may superficially resemble private commercial transactions. These instruments may not bear the formal attributes of a security, but they are in actuality securities. *Landreth,* — U.S. at —, 105 S.Ct. at 2304. The evaluation of such contracts as securities must be done in light of the economic reality of the underlying transactions. *Int'l Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 558, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979). The pivotal factor in this evaluation is that the contract in question "has the functional attributes of stock and other formal securities but [is] not so denominated." *Peoria Union Stock Yards Co. v. Penn. Mut. Life Ins. Co.,* 698 F.2d 320, 324 (7th Cir.1983).

The established test for what is an investment contract is found in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey,* the Supreme Court held that an investment contract was "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party." *Id.* at 298, 66 S.Ct. at 1102. This standard continues to define the meaning of investment contract for purposes of the federal securities laws. *Landreth,* — U.S. at —, 105 S.Ct. at 2304. Although *Howey* presents us with a three-part test, we focus here, as did the district court, on only one of the elements: that an investor rely solely on others' efforts.

Since *Howey* there has been some modification of the requirement that profits result "solely from the efforts of ... [others]." The term "solely" has been interpreted in a flexible manner, not in a literal sense. *Williamson v. Tucker,* 645 F.2d 404, 418 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The proper inquiry now is whether "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson,* 645 F.2d

at 418, *quoting Turner Enterprises,* 474 F.2d at 476. This change was born of the realization that investors may still need the protection of the federal securities laws even though they may have taken on minor duties as part of a common enterprise. *Williamson,* 645 F.2d at 418. A violator of the federal securities laws should not be able to evade liability merely because he parcels out such duties to investors.

Despite the broad remedial purpose behind the federal securities laws, it must be recognized that they were not intended to provide a federal remedy for all fraud or misconduct arising out of commercial transactions. *Marine Bank,* 455 U.S. at 556, 102 S.Ct. at 1223. Agreements negotiated one-on-one creating enterprises in which investors are actively involved, knowledgeable, and able to protect their interests are not within the ambit of the federal securities laws. *Id.* For example the federal securities laws are usually held not generally to apply to general partners. *Odom v. Slavik,* 703 F.2d 212, 215 (6th Cir.1983); *Frazier v. Manson,* 651 F.2d 1078, 1080 (5th Cir.1981). The reason general partners are usually held not covered under the securities laws is that they are entrepreneurs, not investors, and have the ability to take care of their own interests because of the inherent powers available to them. General partners may act on behalf of the partnership and can bind their partners by their actions. They may dissolve the partnership, and they are personally liable for all liabilities of the partnership.

Limited partners, on the other hand, do not share the kind of authority wielded by general partners. Their liability for the partnership is limited to the amount of their investment. They cannot ordinarily dissolve the partnership, nor can they bind other partners. Further, they have little or no authority to take an active part in the management of the partnership. A limited partner's position is analogous to that of a stockholder in a corporation. Limited part-

nership interests may be considered a security within the statutory definition. *E.g., Sibel v. Scott,* 725 F.2d 995, 998 (5th Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823 (1984).

There are, however, instances in which even a general partnership interest may be considered a security. *Williamson,* 645 F.2d at 422. Whether a general partner's or joint venturer's [2] interest may be considered a security depends upon whether:

(1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or

(2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or

(3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Id.* at 424. Nevertheless, a strong presumption remains that a general partnership or joint venture interest is not a security. A party seeking to prove the contrary must bear a heavy burden of proof. *Id.*

■ Appellants as general partners did not meet this heavy burden with regard to the Dickinson Apartment Project Venture, one of those at issue. A review of the joint venture agreement indicates that substantial authority was retained by the investors. Youmans and the other eight investors, excluding Simon and Simmons, controlled 63% of the interest in the venture. Simon and Simmons controlled the remaining 37% interest. Together the investors could terminate the joint venture by majority vote. Moreover, they could also replace the Managing Venturer, Simmons, by majority vote. The joint venture agreement

---

**2.** Our discussion of partnerships applies with equal force to joint ventures since this kind of business investment device is the same for pur-

poses of the federal securities laws. *See Williamson.*

permitted Youmans and the other investors too much power in the Dickinson project for us to conclude this investment could be a security under the *Howey* test.

Youmans also engaged in a number of business transactions not connected with appellees. Thus, it cannot be said that he was inexperienced or unknowledgeable in business affairs. Moreover, the evidence at hand indicates that Simon and Simmons possessed no unique ability that could not be replaced by the investors. Youmans' position with regard to the Dickinson project does not fit within the narrow exceptions of *Williamson*. We, therefore, affirm the district court's summary judgment for the appellees on this venture.

■ We cannot agree with the district court, however, as to the granting of a summary judgment on the Bidco-Tomball Joint Venture. Our review of the joint venture agreement for that project indicates that the investors were deprived of the power to replace the Managing Venturer, Bidco. The power to manage a partnership or a joint venture, or to appoint the one who will, is an essential attribute of a general partner's or joint venturer's authority. *See Fargo Partners v. Dain Corp.*, 540 F.2d 912, 915 (8th Cir.1976); *Mr. Steak, Inc. v. River City Steak, Inc.*, 460 F.2d 666, 670 (10th Cir.1972). Bidco could be replaced as Managing Venturer only in the case of Bidco's dissolution, liquidation, or insolvency, or if Simon and Simmons sold more than 51% of their interest in Bidco, or as an extreme measure if the joint venture were liquidated by a vote of 51% of the venturers and a new venture created without Bidco. The joint venture agreement also rather cryptically permits the "attempted expulsion of any Joint Venturer" upon an affirmative vote of 51%. The interpretation and practical application of these provisions must await further development by the trial court. We reverse the district court's summary judgment on

the Bidco-Tomball project and remand this issue to the district court for trial to determine whether all elements of the modified *Howey* test are satisfied.[3]

■ As to the other transactions involving Youmans' personal guarantee of promissory notes issued by appellees in return for interests in real estate projects, we agree with the district court's finding that Youmans' interests in these projects were not securities. They were private transactions negotiated one-to-one between Youmans and appellees. As such they do not fall within the ambit of the federal securities laws. *Marine Bank*, 455 U.S. at 559, 102 S.Ct. at 1225. Nor do Youmans' guarantees of appellees' promissory notes qualify as securities. They were nothing more than commercial loan transactions. *See National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir.1978).

## III. THE RICO CLAIMS

Appellants brought civil RICO claims against appellees alleging injury as a result of a pattern of racketeering activity. 18 U.S.C. § 1964. These RICO claims were based upon alleged predicate acts of securities law violations, and mail and wire fraud. Predicate acts are those federal and state crimes that RICO defines in detail as "racketeering activity." 18 U.S.C. § 1961(1). The commission of at least two such predicate acts, the last of which occurred within ten years after the commission of a prior act, gives rise to a "pattern of racketeering." 18 U.S.C. § 1961(5). A pattern of racketeering activity is an element of a RICO claim. The district court granted appellees summary judgment on the RICO claims because appellants alleged no injury apart from that resulting directly from the predicate acts. In holding that other injuries also had to be shown, the district court relied upon the Second Circuit decision of

---

**3.** Of particular concern is information not now in the record as to whether the Bidco-Tomball project was a "common enterprise" or not. The record does not indicate whether there were investors other than Youmans and Tatar in this project. *See Marine Bank*, 455 U.S. at 559, 102 S.Ct. at 1225.

*Sedima S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482, 494 (2nd Cir.1984).

■ The Supreme Court, however, reversed the Second Circuit's decision in *Sedima* after the district court's decision in this case. *Sedima S.P.R.L. v. Imrex Co., Inc.*, — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In its opinion, the Supreme Court held that the plain language of the RICO statute, § 1964(c) left "no room ... for an additional, amorphous 'racketeering injury' requirement." *Id.* at —, 105 S.Ct. at 3285. Because appellants need not allege any distinct racketeering injury, and because appellants still allege sufficient predicate acts, including at least one instance of a securities law violation and several instances of mail and wire fraud, we find without merit appellees' position with respect to this issue.

■ Appellees further urge us to dismiss the civil RICO claims because they have not been pled with sufficient particularity. Specifically, they complain that appellants' pleadings fail to distinguish between the "persons" liable and the "enterprise." *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). Appellees also argue that the mail and wire fraud allegations cited as predicate acts have not been pled with the particularity required by Fed.R.Civ.P. 9(b). We decline to consider these challenges at the present time because they have not been passed upon by the district court. *Morosani v. First Nat'l Bank of Atlanta*, 703 F.2d 1220, 1222 (11th Cir.1983) (appellate panel refused to consider at interlocutory appeal stage theories for dismissing RICO claims that were not decided by district court, preferring to remand these theories for the district court to address "in the first instance").

We reverse the district court's summary judgment dismissing appellants' RICO claims. We remand appellants' claims for trial. We also remand to the district court for further consideration appellees' contentions that appellants have not pled their RICO claims with sufficient particularity.

## IV. APPELLANTS' MOTION TO AMEND COMPLAINT

Appellants argue that the district court improperly denied their motion for leave to amend their original complaint. Appellants insist that the district court abused its discretion in denying this motion. Rule 15(a) allows a party to amend its pleadings at least once as a matter of course anytime before a responsive pleading is served or at anytime within twenty days after the initial pleading has been served. At other times, a party must seek the court's permission to amend its pleadings. As the time for amending the initial complaint as a matter of right had passed in this case, appellants sought permission to do so from the district court.

Ordinarily permission "shall be freely given when justice so requires." Fed.R. Civ.P. 15(a). The policy underlying Rule 15(a) is one in favor of liberal amendment. *Thompson v. New York Life Insurance Co.*, 644 F.2d 439, 444 (5th Cir.1981). Nevertheless, a motion to amend the initial complaint is within the discretion of the district court and is subject to reversal on appeal only when that discretion has been abused. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

■ A district court should ordinarily allow a party to file an amended complaint. Acceptable reasons to deny such an amendment are undue delay, bad faith, dilatory motives, repeated failures to cure deficiencies by prior amendment, undue prejudice to the opposing party, or the futility of amendment. *Union Planters Nat'l Leasing, Inc. v. Woods*, 687 F.2d 117, 121 (5th Cir.1982). The district court exercises its discretion by determining whether there is justification for not permitting a party to amend its complaint, not by denying permission to do so for no reason at all. *See id.* In this case, the district court found that appellants' amended complaint merely restated and clarified the allegations of the original complaint. Amendment would not have had any effect favorable to the appel-

lants upon the district court's later judgment. Thus, the district court was within its discretion in denying appellant's motion.

### V. APPELLANTS' MOTION FOR A NEW TRIAL OR TO AMEND JUDGMENT

After the district court had granted summary judgment for appellees, appellants made a motion for a new trial, Fed.R.Civ.P. 59(a), or in the alternative to amend and alter judgment, Fed.R.Civ.P. 59(e). These motions also were dismissed. Appellants now seek our review of their denial.

■ Ordinarily, a district court's decision not to grant a new trial under Rule 59(a) is not appealable. *State Nat'l Bank of El Paso v. U.S.*, 488 F.2d 890, 893 (5th Cir. 1974). An appeal of the denial of a Rule 59(a) motion for a new trial merely restates the attack on the merits of the final judgment. It is from the final judgment that the appeal should be taken. *See Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir.1973); 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2818 & n. 44. The only exception to this rule is when "new matters arise after the entry of the judgment." 11 Wright & Miller at § 2818 & n. 45. This case does not fit within the exception. Appellants' motion for a new trial for the most part merely restated their appeal on the merits.[4] We have already reviewed the merits, and we dismiss the appeal of the denial of the new trial motion.

■ A motion to alter or amend judgment pursuant to Rule 59(e), however, is appealable. *E.g., Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808, 811 (9th Cir.1981); *Weems v. McCloud*, 619 F.2d

1081, 1098 (5th Cir.1980). A district court's decision not to amend or alter judgment may be overturned only for an abuse of discretion. *Weems*, 619 F.2d at 1098. Because appellants' motion for amendment or alteration of judgment merely restated the arguments raised in their motion for a new trial, however, we need not review it as we have already decided the underlying merits of the case. *See Blair v. Delta Air Lines, Inc.*, 344 F.Supp. 367, 368 (S.D.Fla.1972), *aff'd*, 477 F.2d 564 (5th Cir.1973).

### VI. CONCLUSION

With the exception of the Bidco-Tomball project, we affirm the district court's summary judgment holding that the transactions between the appellants and appellees were not securities within the meaning of the federal securities laws. With regard to the Bidco-Tomball project, we reverse the district court's summary judgment and remand for trial because fact issues as to security status remain. The intervening Supreme Court decision in *Sedima* causes us to reverse the district court's summary judgment dismissing appellants' civil RICO claims. These claims are remanded to the district court for trial. We also hold that the district court did not abuse its discretion in denying appellants' motion to amend their original complaint. Finally, we hold that the district court's denial of appellants' motion for a new trial is not appealable. Cast in the alternative as a motion to amend and alter judgment, appellants' motion, though appealable, merely restates the same attack on the merits. We, therefore, dismiss the appeal on this issue as well.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

**4.** Appellants did offer one ground for reconsideration not synonymous with the merits of the case. They complained that the district court did not as required by Rule 56(c) provide them with 10 days notice that appellees' motion for summary judgment would be taken under advisement. Appellants' argument is frivolous. This Circuit has interpreted Rule 56(c) to require only that the party opposing summary judgment be allowed to file "opposing affidavits and briefs ... [so as to] afford an adequate

hearing within the meaning of the rule." *Hamman v. Southwestern Gas Pipeline, Inc.*, 721 F.2d 140, 142 (5th Cir.1983). A "hearing," though, need not be an oral one. *Id.* In this instance, appellees filed their motion for summary judgment on September 24, 1984. Appellants filed their opposition on October 15, 1984. Summary judgment was granted on November 5, 1984. Appellants were given a hearing and their arguments were duly considered.