**RIVANNA TRAWLERS UNLIMITED, et al., Plaintiffs,**

v.

**THOMPSON TRAWLERS, INC., et al., Defendants.**

Civ. A. No. 84–0056(C).

United States District Court, W.D. Virginia, Charlottesville Division.

Dec. 23, 1986.

John W. Zunka, Taylor & Zunka, Ltd. Charlottesville, Va., for Joseph Palumbo.

## MEMORANDUM OPINION

TURK, Chief Judge.

Plaintiffs, partners in a general partnership, sued defendants alleging violations of the Securities Acts. The statutes allegedly violated include § 12(2) of the Securities Act of 1933 (15 U.S.C. § 77*l* (2)), and § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated pursuant thereto. Plaintiffs allege jurisdiction over this action pursuant to § 22 of the Securities Act of 1933 (15 U.S.C. § 77v(a)), § 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and Rule 10b–5. There is no diversity of citizenship. Plaintiffs also make various claims under Virginia law, asserting the pendent jurisdiction of the court. Defendants counter that the court lacks subject matter jurisdiction because the partnership shares involved are not "securities." Defendants also argue that a valid release agreement executed by the parties bars this suit. The case is before the court on defendants' motion for summary judgment.

Brian J. Donato, Edward B. Lowry, Michie, Hamlett, Donato & Lowry, Charlottesville, Va., for all plaintiffs but Cooke.

George H. Gilliam, Paxson, Smith, Boyd & Gilliam, P.C., Charlottesville, Va., for David F. Cooke.

Paul G. Turner, Stephen R. Larson, Charles F. Midkiff, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for Walter B. Salley, Walter B. Salley, Jr. & Salley, Weissinger & Co.

Edward D. McDevitt, Stanley E. Preiser, Preiser & Wilson, Charleston, W. Va., Edward R. Slaughter, Jr., Preiser & Wilson, Charlottesville, Va., for Thompson Trawlers, Inc., T-Craft Boat Co., Thompson Management, Inc., Beeline Seafoods, Inc. Vessel Sales Corp., Worrell Newspapers, Inc. & Thomas E. Worrell, Jr.

## THE PARTIES

Plaintiff, Rivanna Trawlers Unlimited ("RTU") is a general partnership consisting of twenty-three individuals. The partnership operates a commercial fishing business. Eighteen partners have joined in this action. Defendants include a variety of corporations and individuals which have split into two groups. Thompson Trawlers ("TTI"), Thompson Management ("TMI"), Beeline Seafoods, T-Craft Boat Company, Worrell Newspapers, and Vessel Sales are all corporations which were involved in the formation or management of the partnership. All are owned or controlled by Thomas Worrell, Jr. Thomas Worrell, Jr. and Joseph Palumbo are individuals who helped set up the commercial fishing enterprise. These entities and individuals form the "Worrell Group."

Salley Weissinger & Co. is an accounting firm in which defendants Walter Salley, Sr. and Walter Salley, Jr. are members. The firm provided accounting services for many of the individual plaintiffs from the formation of RTU in 1982 until the commencement of this suit in 1984, with defendants Salley acting as individual accountants for some. Walter Salley, Sr. was managing Partner of RTU from its inception until his removal in 1984, and Walter Salley, Jr. was a general partner in RTU. Salley Weissinger and the defendants Salley form the "Salley Group."

## BACKGROUND EVENTS

The individual plaintiffs agreed to invest in RTU in 1982 as a result of representations made by the Salley Group about the financial benefits of owning commercial fishing vessels. The investment scheme presented by the Salley Group called for the investors to purchase four multi-purpose commercial fishing boats known as a sixty-foot Thompson Trawlers (the "Vessels"). The Vessels were to be manufactured, equipped, marketed, sold, operated, managed, and maintained by the various corporate members of the Worrell Group. Thomas Worrell, Jr. oversaw the operation.

The Worrell and Salley Groups represented to the investors that the investment would be profitable because of the particular capabilities of the Vessels. The Vessels were reportedly equipped to harvest a wide variety of commercially valuable fish species. The Vessels were capable of rapidly changing rigging at sea in order to exploit changing weather and fishing conditions. The Vessels were represented to be inexpensive and efficient to operate and maintain because of their fiberglass construction. The Salley group also represented to the individual plaintiffs that their personal liability for any obligations incurred by the partnership would be limited to their initial cash investments, plus a pro rata share of the amount borrowed to finance the purchase of the Vessels.

The Salley Group further represented that none of the general partners would be expected to participate in the operation or management of the Vessels. Under the terms of the RTU partnership agreement only defendant Walter B. Salley, Sr. would be responsible for managing RTU. None of the plaintiffs possessed any knowledge of or experience in the commercial fishing business. They expected to rely on the Worrell Group. Plaintiffs had no intention of participating in the management of the partnership. [Plaintiffs' Affidavits, Paragraphs 6–10.] On August 30, 1982, the partnership agreement was executed and RTU entered into four separate vessel purchase agreements with TTI. RTU also executed four separate management and maintenance agreements with TMI to manage, maintain and repair the Vessels.

The Vessels fell far short of producing the revenues which the Salley Group and Worrell Group had allegedly projected. The operating expenses were much higher than the original calculations. The Vessels allegedly did not meet the performance requisites as represented. RTU suffered extensive losses, necessitating additional cash contributions by the partners. The partners' awareness of problems is evidenced by a letter of July 28, 1983 to Tom Worrell expressing the partners' disappointment with the results to date.

Representatives of the Worrell Group and RTU met several times in an attempt to salvage the project. Dennis Rooker represented the Worrell Group, while Walter Salley, Sr. represented RTU. Various individual partners attended the meetings. As a result of these negotiations, the Worrell Group offered to settle the dispute for $260,000 and to forgive about $12,000 in debt per boat owed by RTU to TMI (about $50,000 total), as consideration for a release to be executed by the RTU partners. RTU retained ownership of the boats and regained control over them. It is disputed whether the Worrell Group demanded and was to receive a complete and all-encompassing release in return for the payment and forgiveness, or whether a limited release of obligations was contemplated. The negotiations culminated with the execution of the Mutual Release Agreement by the defendants and the partners on October 10, 1983.

## EVIDENCE

The partners of RTU are undisputedly a group of educated and sophisticated investors. Twelve of the partners hold advanced degrees, including seven M.D's, two M.B.A.'s, two Masters, one Ph.D., and one J.D. (one partner holds two advanced degrees). Several of the partners hold or have held executive positions in corporations, banks, or insurance companies. As a group they are experienced in business affairs.

The contents of the Partnership Agreement are undisputed. Paragraph Seven of the agreement allows the partnership to make policy and management decisions, upon the concurrence of 60% of the partnership shares, including

> full power to sell and convey partnership assets ... to lease ... [or] mortgage or encumber partnership assets, ... to borrow or lend ... to spend partnership funds for ... [the] acquisition of substantial assets, ... to hire any agent or agents to manage and/or operate any operation of the partnership, and to appoint a successor to the managing partner [Walter B. Salley, Sr.].

Partners were also permitted access to partnership records. Paragraph Nine provided that "[e]ach partner shall have the right to a private audit of the books and records of the partnership...."

The contents of the Mutual Release Agreement signed by all RTU partners are beyond dispute. It was entitled "MUTUAL RELEASE AGREEMENT" at the top of the first page, and listed in capital letters the names of all the Worrell Group companies. The agreement stated that "the parties desire to settle any and all outstanding disputes between them, and to release each other from any liabilities or obligations...." [Agreement at 2.] In Paragraph One, RTU released all of the Worrell Group companies from "any past, present or future liabilities or obligations" resulting from any of the contracts between RTU and the companies. [Agreement at 2.] RTU also accepted the terms of the agreement "in full satisfaction of any and all claims" against the Companies. [Agreement at 2.] In Paragraph Two the companies released RTU in a similar fashion. In Paragraph Three the RTU partners released each other. On page four, Rooker signed for the companies, whose names were listed in capitals above his name. Each partner signed beginning at the middle of the same page. [Agreement at 4.].

Representatives of the Worrell and Salley Groups testified at deposition that the release was intended to be very broad in scope. Walter Salley, Jr., Walter Salley, Sr., and Dennis Rooker agreed that Rooker demanded a complete release in exchange for the monetary settlement. [Salley, Jr. at 48–49; Salley, Sr. at 147, 165–66; Rooker at 61.] Rooker asserted that he drafted the release agreement to reflect the agreement reached at the meetings with RTU. [Rooker at 65, 70.] Neither Rooker nor the Salleys thought that the release was intended to be a limited one.

Plaintiffs maintain that their understanding of the agreement was quite different. Plaintiffs allege that Walter B. Salley, Sr. represented that the sole aim of the agreement was to release TMI from its obligations to manage the Vessels, not to absolve TMI or any other entity from any duty, obligation or liability. [Plaintiffs' Memorandum in Opposition to Motion to Dismiss at 11.] Plaintiffs all signed affidavits which stated, in similar or identical terms, the following:

> 14. In October, 1983, I signed a document I later learned was entitled "Mutual Release Agreement."
> 17. ... I relied on the representation of Walter B. Salley, Sr. as to its meaning, intent and content and I have no recollection of reading this document or obtaining a copy.
> 18. ... Walter B. Salley, Sr. represented to me that the purpose of this document was solely to release the Defendant, Thompson Management, Inc. from some of its obligations to RTU in connection with its management of the four (4) 60 foot Thompson Trawlers owned by RTU and further that it was not intended to release any other entity or person

from any other duty, obligation or liability they might have to RTU or to me.

19. I was not offered a copy of the document by Walter B. Salley, Sr., and after signing it did not see it again until a copy was obtained by my attorneys in the summer of 1984.

20. I reviewed the document after my attorneys showed it to me in the summer of 1984 and found that it did not accurately represent my understanding of those obligations, duties or liabilities which I understood and believed that I was releasing in October of 1983.

21. I did not intend to release any of the defendants, except to the extent set out in Paragraph 18 herein, from any obligation, duties or liabilities they might have to me or to RTU when I signed the document.

22. I was told by Walter B. Salley, Sr. that the purpose of signing the document was to allow the RTU vessels to be moved from Florida to Virginia to begin fishing in Virginia waters.

[Affidavit of Benjamin Word, June 13, 1985; *see* Affidavits of plaintiffs.]

Some of the statements included in the affidavits are supported by the depositions. One of the plaintiffs, Dr. Charles Borchardt, testified that when he asked Walter Salley, Sr. what the document was, Salley replied: "It's just a release so that we can get the damned boats up here...." [Borchardt depo. at 103.] Borchardt signed the agreement without reading it, relying on Salley's representation. [*Id.* at 105, 109.] Another plaintiff, Waldemar Dahl, stated that he also signed the Mutual Release Agreement without reading it, but that he "elected not to read it." [Dahl depo. at 19, 26.] He indicated that Salley told him that it wasn't necessary to read the agreement, and that its purpose was to get control of the Vessels. [*Id.* at 25, 36.] Bruce Cabell also did not read the release before signing it. [Cabell depo. at 37.] He thought RTU was merely terminating the management contract with TMI. [*Id.* at 37.] Joseph May signed the agreement without reading it. [May dep. at 7, 9.] He thought its purpose was to receive compensation and get the boats back. [*Id.* at 9,] The other

plaintiffs testified to the same effect: they didn't read the release, didn't know or understand the extent of the release, and gained an understanding (or misunderstanding) about its contents from Walter Salley, Sr.

Other evidence contradicts the statements made in the plaintiffs' affidavits. Some partners testified on deposition that they were aware of the nature of the release agreement. Furthermore, many if not all of the partners indicated that they had the opportunity to read the agreement. Judge E. Gerald Trembly, a non-plaintiff partner, testified that he read the agreement after it was sent to him at home. [Trembly depo. at 25, 28.] William Dolph, also a non-plaintiff partner, had the entire agreement read to him over the phone by Walter Salley, Sr. [Dolph depo. at 9.] Several of the RTU partners remembered that the agreement itself, or drafts of the agreements, were passed around at a partnership meeting, so that those present would have a chance to review them in detail. [Dr. John Morris, Jr. at 24–25; Mary Reviere at 18; Eleanor Spaar at 13–17.] Dr. Morris, Jr. testified that there were 10 to 12 partners present at the meeting in which the agreement was passed around. [Morris, Jr. at 28] Salley, Sr. stated that "copies were available for anybody," and that draft copies were circulated at a partnership meeting. [Salley, Sr. at 146, 161.] Nothing prevented the partners from reading the release or getting a copy; they refrained from doing so of their own free will. [Borchardt at 114; Cabell at 37; Dahl at 98; May 9–10, 26; Miller at 70–80; Morris, Jr. at 24–25, 27; Riviere at 19–23; Colin Rosse at 42; Spaar at 13, 17; John Youel at 57–58.]

RTU took other actions in regard to its business, in addition to executing the release agreement. In July 1983, as a result of the partners' dissatisfaction with the management situation, RTU replaced TMI with Interport Vessel Management Company, which became active in re-equipping the Vessels. [Salley, Sr. at 95, 172.] Later the investors of RTU again exercised their right to choose the manager of the Vessels,

replacing Interport with an individual manager. [RTU Resolution of 8/24/84.) At this same meeting they removed Walter Salley, Sr. as Managing Partner. [*Id.*]

## DECISION OF THE COURT

Reviewing all factual conflicts in a light most favorable to the plaintiff, the court concludes that the partnership interests are not securities, and that therefore the court is without jurisdiction to adjudicate this case. Furthermore, the court is of the opinion that the Mutual Release Agreement was valid and sufficient to bind the parties, and that plaintiffs have no legal or factual bases upon which to avoid its effect.

### 1. *The Partnership Interests As Securities*

The court's jurisdiction in a securities law case depends on whether the investment instrument at issue falls within the class of instruments defined as "securities" by the Securities Act of 1933 and the Securities Exchange Act of 1934.

One such instrument defined as a security is an "investment contract."[1] "[A]n investment contract for the purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party." *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). However, "the fact that the investors here were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that [the scheme] is an investment contract." *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). An investment scheme will be considered a security when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts

which affect the failure or success of the enterprise." *Id.* at 482. *Accord Securities & Exchange Commission v. Koskot International, Inc.*, 497 F.2d 473 (5th Cir.1974).

In determining whether a partnership or joint venture comes under the securities law, courts have considered the powers that the investors or partners are legally entitled to, rather than what powers they exercised or expected to exercise. In *Williamson v. Tucker*, 645 F.2d 404 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), the court was presented with the issue of "whether the powers possessed by the joint venturers in the joint ventures agreement were so significant that, regardless of the degree to which such powers were exercised, the investments could not have been premised on a reasonable expectation of profits to be derived from the management efforts of others." *Id.* at 419. The Court remarked that other courts have uniformly refused to define investments as securities in cases where "the power retained by the investors is a real one which they are in fact capable of exercising...." *Id.* at 419; *Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir.1983) (plaintiff could not establish that they lacked the *power* under the partnership agreement to exercise his partnership functions). The *actual* control exercised by the investor is irrelevant. 645 F.2d at 421. *See Schultz v. Dain Corp.*, 568 F.2d 612 (8th Cir.1978); *Ballard & Cordell Corp. v. Zoller & Dannenberg Exploration, Ltd.*, 544 F.2d 1059 (10th Cir.1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977); *Fargo Partners v. Dain Corp.* 540 F.2d 912 (8th Cir.1976); *Mr. Steak v. River City Steak, Inc.*, 460 F.2d 666 (10th Cir. 1972); *Hirsch v. duPont*, 396 F.Supp. 1214 (S.D.N.Y.), *aff'd*, 553 F.2d 750 (2d Cir.1977).

■ Even when general partners do not individually have decisive control over major decisions, they do have the sort of influence which generally provides them with access to important information and protec-

---

**1.** The definitional sections are § 2(1) of the 1933 Act, 15 U.S.C. § 77b(1), and § 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10). *See Wil-* *liamson v. Tucker*, 645 F.2d 404, 417 n. 11 (5th Cir.1981).

tion against a dependence on others. *Williamson*, 645 F.2d at 422. *Accord Youmans v. Simon*, 791 F.2d 341, 346 (5th Cir.1986). Furthermore, even when a partner wishes not to participate, he is unavoidably, even if unwillingly, a part of the operation of the enterprise. *Goodwin v. Elkins & Co.*, 730 F.2d 99, 103 (3d Cir. 1984). The managerial powers and right of inspection vested in general partners therefore takes them outside the intended scope of federal securities law. *Odom*, 703 F.2d at 215. The court in *Williamson* warned that "[a]n investor who is offered an interest in a general partnership ... should be on notice, ... that his ownership rights are significant, and that the federal securities acts will not protect him from a mere failure to exercise his rights." 645 F.2d at 422.

█ For a partnership to be deemed an investment contract the partners must be so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control. *Williamson*, 645 F.2d at 424. Even the most knowledgeable partner may be left with no meaningful option when there is no reasonable replacement for the investment's manager. *Id.* at 423. However, reliance on others does not exist merely because the partners have chosen to hire another party to manage their investment. *Id.* at 424; *Gordon v. Terry*, 684 F.2d 736, 742 (11th Cir.1982).

There are three limited situations in which an interest in a general partnership may be designated a security. *Williamson*, 645 F.2d at 424. One is when the investor can establish that "an agreement among the parties leaves so little power in the hands of the partner ... that the arrangement [is] in fact ... a limited partnership." Another such situation exists when the partner is so inexperienced and naive in business affairs that he is incapable of intelligently exercising his partnership powers. The third occurs when the partner is so dependent "on some unique ... managerial ability ... of the manager that he cannot replace the manager of the enterprise...." 645 F.2d at 424; *Youmans*, 791 F.2d at 346. Nevertheless, a strong presumption remains that a general part-

nership interest is not a security. *Youmans*, 791 F.2d at 346. "[A]n investor who claims his general partnership ... is an investment contract has a difficult burden to overcome." *Williamson*, 645 F.2d at 424.

█ The court concludes that plaintiffs have failed to rebut the presumption that a general partner has enough control over the enterprise in which he invests to protect his own interest. Plaintiffs suggest two avenues by which they hope to rebut this presumption. First, they allege that at the time the partnership was formed, the partners had no intention of exercising their rights to manage their investment. Plaintiffs state that they intended to rely entirely on the expertise of TMI and the Worrell defendants to receive a return on their investment. [*See* Plaintiffs' Affidavits, Paragraph 10.] Therefore, they essentially allege that this intention deprived them of any role in the partnership, in effect converting it into a limited partnership.

Whatever the intentions of the partners of RTU were at the time of formation of the venture, the partners in fact retained ultimate control over the affairs of the partnership. The terms of the partnership itself reflect the control the partners could exercise. The partners retained the capacity to dispose of or otherwise alter partnership assets, and to choose or replace a manager. The partners also had access to partnership books and record. These powers allowed the partners to participate in the enterprise in a meaningful fashion. The powers were "real one[s]" which the partners were "in fact capable of exercising." *Williamson*, 645 F.2d at 419. The partners' capability was manifested by their replacement of one management company with another.

Second, plaintiffs suggest that they were so inexperienced and naive about the commercial fishing industry that they were incapable of exercising their powers, and that TMI and the Worrell defendants possessed unique managerial abilities which the plaintiffs were forced to rely on and

which were non-replaceable. [*See* Plaintiffs' Affidavits, Paragraphs 7, 9.]

Several facts contradict these assertions of inexperience and dependence. First, while plaintiffs obviously chose the Worrell group based on its experience, defendants did not have "unique managerial skills" which were non-replaceable. This is illustrated by the replacement of TMI with Interport Vessel Management as managers by vote of the partners, an act which is undisputed. It seems that what the Worrell group had to offer was boats, equipment, maintenance, and management "under one roof." The relationship between the various Worrell defendants may have facilitated the running of the venture, but did not amount to unique or irreplaceable expertise. Second, while the plaintiffs may have been inexperienced in *this* particular industry, they certainly were not inexperienced and unknowledgeable in business affairs and management, as illustrated by their impressive *curriculum vitae.* This knowledge was manifested by the letter discussed at a partnership meeting and signed by several of the plaintiffs. [See Borchardt depo. at 37–44.]

This case is similar to that of *Youmans v. Simon,* 791 F.2d 341 (5th Cir.1986). There, Youmans and eight other investors controlled 63% of a venture, with two other investors controling 37%. Together Youmans and the other investors could terminate the joint venture by majority vote, and could replace the Managing Venturer, Simmons, by majority vote. The court concluded that "[t]he joint venture agreement permitted Youmans and the other investors too much power in the [venture]" for their interests to be securities under the *Howey* test. *Id.* at 346–47. The court noted that plaintiff engaged in several business transactions not connected with the defendants. Youmans was not inexperienced or unknowledgeable in business affairs. *Id.* at 347. The evidence also indicated that Simon and Simmons possessed no unique ability that could not be replaced by the investors. *Id.* at 347. *See Perry v. Gammon,* 583 F.Supp. 1230, 1232–33 (N.D.Ga. 1984) (holding investment not security when plaintiffs intended to rely on defend-

ant for management of apartments, but retained power to disaffirm management contract on short notice).

In the instant case, it is clear that plaintiffs retained significant power to control the partnership venture. Plaintiffs were intelligent and experienced in business matters. Plaintiffs were capable of exercising significant partnership powers as when they replaced TMI with another manager. The court concludes as a matter of law that plaintiffs have failed to rebut the presumption that their partnership interests were not securities. Since the subject matter jurisdiction of the court is premised on the federal securities laws, which are inapplicable here, and since there is no other basis for federal jurisdiction, the court concludes that the case must be dismissed for want of jurisdiction.

## II. *The Mutual Release Agreement*

Even assuming that the partnership shares fell within the definition of a "security," the court believes that the Mutual Release Agreement is valid and dispositive. Plaintiffs have attempted to vitiate the effect of the Mutual Release Agreement by arguing that defendants induced plaintiffs to sign the release by misrepresenting the nature of the release.

It is well settled rule that a party executing a general release does so at his own risk. In *Redel's Inc. v. General Electric Co.,* 498 F.2d 95 (5th Cir.1974), the plaintiff was a franchised dealer for G.E., who renewed the franchise agreement annually. In the most recent renewal contract G.E. had included a general release agreement, whereby Redel's released G.E. from "all claims, demands ... and liabilities" arising out of the franchise. Redel's asserted that the inclusion of the general release by G.E. constituted a breach of its duties as a fiduciary. *Id.* at 100. The court, finding this assertion "plainly frivolous" remarked that "Redel's can be allowed no escape for the failure of its highest officer to read language in the agreements he executed on behalf of the company." *Id.; Fitzwater v. Lambert and Barr, Inc.,* 539 F.Supp. 282,

295 (W.D.Ark.1982) ("An injured party who is able to read has no right to rely upon the alleged misrepresentations as to the contents of a release."). *See also Virginia Impression Products Co. v. SCM Corp.,* 448 F.2d 262 (4th Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972); *Pettinelli v. Danzig,* 722 F.2d 706, 710 (11th Cir.1984) (reliance on representations of adversaries unjustified).

The law of Virginia on releases is similar. *Nationwide Mutual Insurance Co. v. Muncy,* 217 Va. 916, 234 S.E.2d 70 (1977). There Muncy claimed that a material misrepresentation voided a release on an insurance company form that she had signed to receive a check. The Virginia Supreme Court held that there was no fraud. The Court took into account Muncy's claim that she did not read the release she signed until *after* she had signed it and received her check. Muncy alleged she was misled because the insurance adjuster told her the release was "kind of like a receipt" to enable her to purchase a car. The court found this statement insufficient to be a misrepresentation that would void the release. The Court noted that

> the [plaintiff] had the ability and the opportunity to read the release, and it was her duty to do so before signing it. Her excuse that [the adjuster] wanted to leave for dinner is inadequate. As we said in *Corbett* [*v. Conney,* 202 Va. 933, 121 S.E.2d 476 (1961) ], she "cannot invoke her own heedlessness to discredit her solemn release, and call such heedlessness another person's fraud."

234 S.E.2d at 74. In the context of a deed the court has remarked, "Failure to read [the deed] will not relieve him of obligations entered under it, and will not constitute fraud unless the grantee prevented the grantor's reading or induced the grantor not to read it." *Carter v. Carter,* 223 Va. 505, 509, 291 S.E.2d 218, 221 (1982).

In the instant case, plaintiffs claim that they signed the agreement, believing it to be a limited release, because of the alleged misrepresentations of the Managing Partner, Walter Salley, Sr. The partners argue that they justifiably relied on Salley's representation concerning the contents of the agreement because of Salley's fiduciary relationship to them, as their accountant and Managing Partner. They urge that this relationship and trust justified their signing the agreement without reading it or making any inquiries. Plaintiffs imply that they had no independent knowledge of the contents of the agreement.

██ It is undisputed that at least two partners, Judge Tremblay and William Dolph, both members of the negotiating team, remember that the release agreement was intended to be a release of all claims. They signed the release knowing it to be a global release. [Tremblay at 18, 20, 22; Dolph at 5, 9]. Even if none of the other partners knew of the negotiations and knew nothing about the release, under § 50–12 of the Virginia Code, the knowledge of Tremblay and Dolph is imputed to the partnership and its members. Section 50–12 reads:

> Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, ... operate[s] as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

There is no evidence that Judge Tremblay or William Dolph committed or consented to the alleged fraud on RTU. Therefore their knowledge that the release was universal is imputed to RTU and to every partner of RTU. Because of this imputed knowledge, plaintiffs cannot complain that they were fraudulently induced to sign the release believing it to be a limited one. General partnership principles also impute the knowledge of one partner to all others. *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 757 (3d Cir.1976); *Engl v. Berg,* 511 F.Supp. 1146, 1154 (E.D.Pa. 1981).

██ Even if the court does not impute knowledge of the contents of the release to RTU partners, the partners signing had the obligation to make a reasonable and independent inquiry into its contents. On deposition plaintiffs failed to give a reason for

not reading the release, except that Salley had told them that signing it was necessary to get the Vessels back. Most of the partners signed the release without seeking out any details concerning its contents.

The court concludes that plaintiffs' failure to read the release before signing it prevents them from alleging fraud. It is not unreasonable to require a party to read what he signs when he has the opportunity to review it. Several partners testified that copies of the release agreement were available for review. Assuming that defendant Salley made the misrepresentations alleged by plaintiffs, this deception did not excuse their failure to read the release. *Redel's*, 498 F.2d at 100; *Fitzwater*, 539 F.Supp. at 295. Since plaintiffs voluntarily refrained from reading the release, they cannot now claim justifiable reliance on a misrepresentation.

Because the knowledge of the contents of the release is imputed to all plaintiffs, and because plaintiffs failed to read the release before signing it, the court concludes as a matter of law that any misrepresentations made by defendant Salley do not vitiate the effect of the Mutual Release Agreement.

### CONCLUSION

For the above reasons the court concludes that it lacks jurisdiction over this matter because the partnership interests held by plaintiffs were not "securities" as defined by the federal securities laws. Furthermore, the court finds that the release executed by the parties is dispositive of all the substantive claims raised by the parties. The court finds it unnecessary to consider the pendent claims. An appropriate order will be entered this day.